STATE v. R. G. EVANS.[1]

January 16, 1903.

Nos. 13,116—(10).

### Swindling—Evidence.

The words of one person engaged in the commission of the crime of swindling (G. S. 1894, § 6595), although not in the presence of other participants, but leading up to and being a part of the offense itself, are competent against all of the parties.

### Charge to Jury—Oratory of Counsel.

The court below charged the jury that the trial was not an oratorical contest between the eloquent counsel engaged therein, and that the jurors

[1] Reported in 92 N. W. 976.

were not sitting "to determine which one made the most eloquent speech or emitted the largest volume of sound." *Held*, that this portion of the charge was not erroneous. Pervasive eloquence and vociferous oratory by counsel should not be allowed to control a verdict, and the trial court may so charge, care being taken to do so in temperate, impartial, and concise language.

### Assignments of Error.

Certain assignments of error considered and disposed of.

### Verdict Sustained by Evidence.

*Held*, that the testimony in behalf of the state in this case was ample to support a verdict of guilty.

Appeal by defendant from an order of the district court for Ramsey county, Bunn, J., denying a motion for a new trial, after a trial and conviction of the crime of swindling. Affirmed.

*H. E. Hall, E. E. McDonald* and *F. G. Hamer*, for appellant.

*T. R. Kane*, County Attorney, and *O. H. O'Neill*, Assistant County Attorney, for the State.

COLLINS, J.

The defendant, Evans, jointly with Fay and Cartney, was indicted for swindling, under the provisions of G. S. 1894, § 6595. He demanded a separate trial, and was found guilty as charged.

Upon appeal a large number of assignments of error are presented for our consideration. Some of them are cumulative, and others need not be mentioned. All may be placed under four distinct heads: First, abuse of discretion on the part of the trial court in refusing to find as true the defendant's challenges of actual bias, interposed, as they were called, to five of the jurors; second, that the indictment did not state facts sufficient to constitute a public offense; third, that the verdict was not justified by the evidence; fourth, that errors in law, other than those in respect to challenges for actual bias, occurred at the trial, which were duly excepted to, or in law were deemed to have been excepted to.

1. By G. S. 1894, § 7374, it is provided that challenges to jurors for actual bias shall be submitted to triers, unless, in cases not capital, the parties consent to a trial by the court. And, further,

it is enacted (section 7382) that the decision of the triers shall be final. In State v. Mims, 26 Minn. 183, 2 N. W. 494, 683, it was held in a criminal case, as it had previously been held in a civil action, that the decision of a trial court upon the question of the actual bias of a challenged juror was a finality, and that it could not be reviewed, although brought to this court through a properly taken exception. This rule was followed in State v. Durnam, 73 Minn. 150, 75 N. W. 1127, and State v. Feldman, 80 Minn. 314, 83 N. W. 182, and is the settled law in this jurisdiction. The point made by counsel for the defendant that under the evidence here, which he insists conclusively established the actual bias of at least one of the challenged jurors, the question is one of law, not governed by the rule established in the Mims case, and, on appeal, to be disposed of without regard to the ruling below or the statute. We do not agree with counsel as to the conclusiveness of the evidence upon the question of bias, but, if we did, the statute is plain and unambiguous. If it is wrong, the remedy is with the people, and for more than twenty years (since the Mims case was determined, in 1879) the conclusion then reached as to the finality of the action of the court on this subject has been acquiesced in.

2. The indictment was sufficient in every respect. It followed one charging the same statutory offense, and held to be sufficient in State v. Gray, 29 Minn. 142, 12 N. W. 455. The principle to be applied is that, when an offense is created by statute, which sets forth with precision and certainty all the elements of the offense, an indictment is sufficient which charges the offense in the words of the statute. This statute is sufficiently precise and certain, when we consider the infinite number of ways in which swindling by cards and other means or devices may be perpetrated, and the ingenuity of the men who are engaged in that class of crime.

3. It is strenuously argued that the evidence was insufficient to warrant a conviction. We do not intend to repeat in full the evidence introduced by the state upon the trial, but a brief statement seems necessary. Nortrup, the complaining witness, was a German boy, eighteen years of age. He had been in this country but four years, residing in New York City. He arrived at the

Union Station in St. Paul about noon on October 26, 1901, on his way to visit relatives in Pine county. He then learned that he could not proceed on his journey until night, and, after buying a ticket, and checking his baggage for his destination, started out to see the "sights of the city," as he expressed it. From his testimony it appears that while looking at the window display of Kennedy Bros.' store, on the corner of Third and Robert streets, he was accosted by defendant Fay, a man several years older than himself, and asked several questions; among others, the way to the new state capitol building, to which he replied that he was a stranger, and did not know. Fay immediately announced that he was a stranger also, having several spare hours on his hands. Fay soon afterwards proposed to Nortrup that they go together to the new capitol. They started, and on the way Fay frequently inquired the location. They finally reached a high board fence which surrounded the grounds and the building. Here they were met by defendant Evans, also a much older man than Nortrup, and the three engaged in conversation. Soon afterward Nortrup was induced by his newly found companions to visit a distant residence portion of the city. While in that locality, not far from the Hotel Aberdeen, the three met Cartney, a man at least sixty years of age, and it was while these four were together that the alleged swindling took place. It was by means of six business cards printed on but one side, which Evans took out of his pocket before meeting Cartney, and on the back of one of which he wrote the word "cigars." The trick was to draw the card thus marked from among the six while all were held by Evans, the drawing to be made by Nortrup, and it was just after the latter had failed to draw the marked card that Chief of Police Clark and Officer Morgan, who were riding by in citizen's clothes, observed the men, noticed some suspicious circumstances, and interfered.

We are clearly of the opinion that the testimony introduced by the state was ample to warrant a conviction. More than this, it was so clear as to demonstrate with all reasonable certainty that the three men, Evans, Fay and Cartney, were confederates, and from the time Fay met Nortrup until the parties were arrested they were acting in concert in a scheme to swindle their victim.

The circumstances all pointed to such a conclusion. It was the old, old game, and many circumstances shown at the trial might have led the jury to believe that these three men were engaged together as "bunco steerers."

Some of these may be pointed out as follows: The unusual manner in which Fay met Nortrup, a stranger, telling him that he was also a stranger in the city (which was not true); Fay's suggestion that they visit the new capitol grounds together, when, according to the latter's testimony, he had business on his hands, which needed prompt attention; the meeting with Evans, another alleged stranger, near the entrance to the capitol grounds; the interest manifested by the latter in Nortrup; his leaving the latter and Fay, ostensibly to visit a drug store he never visited, but which gave him an opportunity to see the other confederate, Cartney, and to arrange matters with him; his return for the sole purpose, as he testified, to again meet Fay, that he might determine whether or not he had previously seen him in Chicago; the joint effort made by these two to induce Nortrup to go up into the residence portion of the city, some ten or twelve blocks from the business part; the fact that on the way Evans introduced the card trick, and showed Nortrup how it might be used to win money; their somewhat surprising meeting with Cartney, who also announced himself as a stranger, looking for the residence of a daughter; the promptness with which Evans suggested to Nortrup that they might get the old man (Cartney) to bet on the trick; the latter's refusal to bet soda water, as suggested, but his willingness to bet money; the offer of Evans to wager $3 with Cartney that Nortrup could pull the marked card out of the six; the fact that the offer was accepted, but no money was put up; that Nortrup selected the marked card, Evans holding the six; that Cartney paid over the $3 to Evans, who pocketed $2 and gave Nortrup $1, with a suggestion at once that the $3 be returned to Cartney as a bait; the latter's anxiety, immediately manifested, to bet $200 that Nortrup could not draw the marked card a second time; Cartney's assertion that he had $700 with him, when, as a matter of fact, he had less than $14 when searched at the police station; Evans' statement that he would put up $25 if Nortrup

would put up his money, amounting to $60, as the parties had previously learned; the fact that, as soon as Nortrup drew his $60 from his pocket, it was snatched by Evans, and handed to the stranger, Cartney, his betting adversary, although he had put up no money; Evans urging Nortrup to pull the card while he held the six; the latter's failure to do so, and Evans' advice to him to say nothing about the loss, because he had been gambling, coupled with an offer to give him $50 if he would go down town where he (Evans) could get a draft cashed; the fact that, immediately upon discovering the approaching police, Evans seized the roll of money from Cartney, and, handing it to Nortrup, urged him to "sneak," as the police were after them; that both Evans and Fay then unsuccessfully attempted to escape from the officers; that at the police station Evans demanded $25 of the money taken from Nortrup by the chief, claiming it to be his, and, to use his own slang, had been used to "plug" Nortrup; that he gave an assumed name to the police; that Fay, when testifying in Evans' behalf, would not deny that he had met and talked with both Evans and Cartney during the week previous to this affair; that Fay upon crossexamination admitted that he had at one time gone under an assumed name, and had also been indicted in Chicago under another assumed name for receiving stolen goods; that (according to his own story) Evans had wandered from place to place in the United States without having any business except occasionally to help his wife and mother-in-law in their management of boarding and rooming houses, and in fact that soon after the four arrived at the police station Evans sent his wife to buy tobacco for Fay and Cartney.

These circumstances pointed very strongly towards the concerted action and the guilt-of these men, and could not well be reconciled with the innocence of either. The learned trial court was justified in designating Evans, Fay, and Cartney as a "trio of swindlers" when he denied the motion for a new trial, for there was an abundance of evidence to sustain the belief that they were experienced men in this line of work.

4. It is claimed that the court erred in overruling the objection made by defendant's counsel to a question asked the witness Nort-

rup as to his conversation with Fay before they met Evans. Conceding that this testimony was not admissible at the time it was offered and received, it was afterwards shown, beyond a reasonable doubt, as before stated, that these persons were operating together in the commission of the statutory offense, and this led to the irresistible conclusion that their plans had been prearranged, and that they were acting under a well-understood scheme, whereby Fay was to select and "steer" the victim into the company of Evans and Cartney. Words of one person engaged in such an enterprise while not in the presence of others, also engaged in it, but leading up to and being a part of the offense itself, in which all share, are competent against all of the parties, and, had this testimony been offered later, after full details of the offense had been given in evidence, it would have been unobjectionable beyond a doubt. The order of proof was not material.

5. Defendant assigns as error the refusal of the court to strike out the answer of Mrs. Evans when testifying, "No, sir," in reply to a question as to the nonpayment of rent by defendant when they were living in St. Paul at some previous time. There are two reasons why the ruling was not erroneous: First, the witness had insisted that when living in the house in question they had plenty of means, and a failure to pay house rent would tend to show that they were without means; and, second, she denied that they did not pay the rent, and there the whole matter was allowed to rest, no attempt being made to show her to have been untruthful. Certainly the defendant was not prejudiced by either question or answer.

6. The trial court instructed the jury fully and fairly on the law pertaining to the offense charged, but cautioned against a disregard of the evidence, through sympathy, or by reason of counsel's eloquence and oratory. The court said:

"This is not an oratorical contest, for instance, between the two eloquent counsel here. You are not sitting as judges to give your decision in favor of the one that makes the most eloquent speech, or emits the largest volume of sound."

In behalf of defendant it is insisted that these remarks constituted error, for which a new trial should be granted. We do not regard the quoted language as improper. It is the law beyond question that the .evidence is to govern in all cases, criminal and civil, and that jurors are not to be diverted from its careful consideration either by compassion for a party, or by the rhetorical blandishments of counsel. Pervasive eloquence and vociferous oratory by counsel should not be allowed to control a verdict, and a court may so charge, care being taken to do so in temperate, impartial, and concise language. The charge on this point did not violate the rule.

Order affirmed.