STATE v. THERON H. BLY.[1]

July 27, 1906.

Nos. 14,748—(26).

**Abortion—Indictment.**

A criminal indictment is sufficient which charges: "The said ——— * * * did, * * * and with the intent to produce the miscarriage of a woman, ———, * * * being then and there pregnant with child,

[1] Reported in 108 N. W. 833.

\* \* \* use and employ in and upon the body and person of the said —— certain instruments and other means, a more particular description of \* \* \* said instruments and other means being to the grand jurors unknown, and the said —— did then and there and thereby produce the miscarriage of the said ——," etc.

**Verdict—Evidence.**

The evidence is sufficient to support the verdict of guilty, although it does not appear what particular kind of instrument was used or in what manner the defendant operated in and upon the body to accomplish the result.

**Res Gestæ.**

Not error to exclude certain declarations claimed to be a part of the res gestæ.

Appeal by defendant from an order of the district court for Hennepin county, Dickinson, J., denying a motion for a new trial, after a trial and conviction of the crime of abortion. Affirmed.

*R. L. Penney, W. E. Dodge,* and *E. L. Sutton,* for appellant.

*Edward T. Young,* Attorney General, *Charles S. Jelley,* Assistant Attorney General, and *Al. J. Smith,* County Attorney, for the State.

LEWIS, J.

Appellant was convicted under the following indictment, and the first point urged is that the indictment does not state facts sufficient to constitute a public offense:

Theron H. Bly is accused by the grand jury of the county of Hennepin, in the state of Minnesota, by this indictment, of the crime of abortion, committed as follows: The said Theron H. Bly on the sixth day of December, A. D. 1904, at the city of Minneapolis, in said Hennepin county, then and there being, did wilfully, unlawfully, wrongfully, knowingly, and feloniously, and with the intent to produce the miscarriage of a woman, to wit, one Hilda Rosen, said Hilda Rosen being then and there pregnant with child, prescribe for and supply to the said Hilda Rosen certain medicine and drugs, and use and employ in and upon the body and person of the said Hilda Rosen certain instruments and other means, a more particular description of said medicine and drugs and said instruments and other means being to the grand jurors unknown, and the said Theron H. Bly

did then and there and thereby produce the miscarriage of the said Hilda Rosen, said medicine and drugs, and the use of said instruments and other means, and such miscarriage not being then and there necessary to preserve the life of the said Hilda Rosen, or of the child with which she, the said Hilda Rosen, was at said time pregnant, contrary to the statute in such case made and provided, and against the peace and dignity of the state of Minnesota.

Our statute upon the subject is as follows:

A person, who, with intent thereby to produce the miscarriage of a woman, unless the same is necessary to preserve the life of the woman or of the child with which she is pregnant, either: (1) Prescribes, supplies or administers to a woman whether pregnant or not, or advises or causes a woman to take any medicine, drug or substance; or (2) uses, or causes to be used, any instrument or other means—is guilty, etc.   G. S. 1894, § 6545.

We consider the indictment good; but the criticism is that it does not inform the defendant of the cause of the accusation as provided by the Bill of Rights; that the charging part, and person "and use and employ in and upon the body of the said Hilda Rosen certain instruments and other means" "being to the grand jurors unknown," is insufficient; that the party charged is not furnished with a reasonably specific statement as to the character of instruments or "other means" and the manner of their use.

Appellant claims that the indictment merely charges the definition of a crime by its statutory name and that it was accomplished by means to the grand jury unknown, and, the state having elected to abandon the charge that drugs or medicines were used and stand on the allegation of the use of instruments and other means, the jury were permitted to enter the field of conjecture and guess what means were used.

The principal case cited in support of this criticism is Cochran v. People, 175 Ill. 28, 51 N. E. 845. We have read the case with care, but are unwilling to adopt the reasoning. The charge was in the following language: "Did unlawfully and feloniously administer and use on one Stella Roberts, then and there being a woman pregnant

with child, a certain instrument, the name of which is to the grand jurors unknown, with the intent then and there," etc. The statute read: "Whoever by means of any instrument, medicine, drug or other means whatever causes," etc. The court held the indictment bad because it was not stated in what manner the instrument was used, but admit it would have been sufficient had Baker v. People, 105 Ill. 452, been followed. In that case the particular place of inserting the instrument was stated. We see no merit in the suggestions that the offender was taken by surprise and unable to prepare his defense simply because it was not stated in what particular manner the instrument was used.

However, in the indictment before us the charge is that appellant employed in and on the body of Hilda Rosen, a pregnant woman, certain instruments and other means to the grand jury unknown, with intent to produce a miscarriage, and by such means did produce a miscarriage. Here is a direct charge that the person operated upon was pregnant, that a miscarriage was produced, that it was produced by appellant, and he did so by operating in and on her body, that the purpose of so operating was to bring about the result accomplished, and that in so doing he used instruments or operated in and on her body in some other way unknown. This is as far as the state may reasonably be required to go in stating the particulars in such cases. That it does not sufficiently notify the offender of the nature of the charge to enable him to prepare for trial has no reasonable foundation. That his defense could possibly turn or depend on the exact instrument or method of operation is not within the realm of possibility. Every essential item is set out for his enlightenment — the time, place, woman, her condition, and the fact of miscarriage by his operations upon and in her body.

An instance where the indictment is sufficient, when set forth in the statutory language, is found in State v. Evans, 88 Minn. 262, 92 N. W. 976. The charge was swindling, and was alleged to have been accomplished "by the use and means of three-card monte so-called, and the forms and devices of sleight of hand, a more particular description of which is to the grand jury unknown, from one August Northrop, by the use of cards and instruments of like character more particular description of which is to the grand jury unknown," etc. In sustaining

the indictment, which followed the statute (G. S. 1894, § 6595), the court said: "The statute is sufficiently precise and certain when we consider the infinite number of ways in which swindling by cards and other means or devices may be perpetrated, and the ingenuity of men who are engaged in that class of crime."

Another case which illustrates the principle that no more is required in charging a crime than the circumstances of the case will permit is the noted case of Com. v. Webster, 5 Cush. 295, 321, 52 Am. Dec. 711. The count under consideration was as follows: "That the said John W. Webster, at Boston aforesaid, in the county aforesaid, in a certain building, known as the 'Medical College,' there situate, on the twenty-third day of November last past, in and upon the said George Parkman, feloniously, wilfully, and of his malice aforethought did make an assault, and him, the said George Parkman, in some way and manner and by some means, instruments, and weapons to the jurors unknown, did then and there feloniously, wilfully, and of malice aforethought deprive of life, so that he, the said George Parkman, then and there died," etc.

In holding the count good the court said: "From the necessity of the case, we think it must be so, because cases may be imagined where the death is proved, and even where remains of the deceased are discovered and identified, and yet they may afford no certain evidence of the form in which the death was occasioned, and then we think it is proper for the jury to say that it is by means to them unknown. * * * The rules of law require the grand jury to state their charge with as much certainty as the circumstances of the case will permit; and if the circumstances will not permit a fuller and more precise statement of the mode in which the death is occasioned, this count conforms to the rules of law."

We also consider the evidence sufficient to support the verdict of guilty. Hilda Rosen was unmarried, about twenty five years of age, in good health, and resided with and kept house for her father at Two Harbors, Minnesota. The father was a widower with several children. The defendant, Theron H. Bly, was a licensed physician of Minneapolis, claiming to be a specialist in diseases of women, and in charge of Bly's Private Sanatorium for Women. In August, 1904, Hilda Rosen

wrote to the defendant, and in reply to her letter received the following letter from Bly:

T. H. Bly, M. D. Twenty Seven Years in Practice. Specialist in all Diseases of Women. Physician in Charge of Bly's Private Sanatorium for Women, Before and During Confinement. Everything Confidential. Office Address: 412 Nicollet Ave., Rooms 8 and 9, Third Floor.

Minneapolis, Minn., Aug. 10, 1904.

Hilda Rosen:

Yours at hand today with contents will send you the medicine in a little box today, if it should fail you would have to come here for a guaranteed cure.

Yours very resp., T. H. Bly, M. D.

In September following the girl again wrote to the defendant, and in reply received the following letter:

(Same Heading.)

Minneapolis, Minn., 9—12—04

Hilda Rosen:

Yours at hand in reply will say am sorry you did not come out all right. Now I will do this if you are not too far advanced I will take your case and see you through for $75.00 will look after you myself and see you get the best of care and guarantee you will be all right. You know me and know I am square and honest with you in every way.

Yours very truly, T. H. Bly, M. D.

Bring this with you.

In November the girl wrote to the defendant, and in reply received the following letter from Bly:

(Same Heading.)

Minneapolis, Minn., 11—26—04.

Hilda Rosen:

Yours at hand in reply will say your case would be one hundred dollars although it depends how far along you are before

you come, please let me know when you were unwell or had your menstrual flow then I will let you know by return mail what I can do for you.

Yours very truly,                    T. H. Bly, M. D.

P. S.   I will guarantee a cure if I take your case.

In November she again wrote to the defendant, and in reply received the following letter from Bly:

(Same Heading.)

Minneapolis, Minn., 11—30—04.

Hilda Rosen:

Yours at hand in reply to yours will say that according to the last menstruation you would be 4½ months.   I can't make price less and give you best service, would be glad to do so if I could you know I am all right and you don't have to take any chances.

Yours very truly,                    T. H. Bly, M. D.

The envelope containing this last letter was postmarked at Minneapolis, November 30, 1904, at ten p. m., and in due course of mail was received by the girl at Two Harbors, Minnesota, on the first or second day of December, 1904.

On December 5, 1904, the girl, accompanied by her father, left Two Harbors and came to Minneapolis, arriving at the Union Depot on the 6th, about seven o'clock in the morning.   They had breakfast and secured a room on Sixth street.   In the afternoon, according to the father's testimony, they went down Nicollet avenue, and she pointed out to her father an office building with a sign on an office window "Dr. Bly," and leaving him she went upstairs to the defendant's office. The girl remained upstairs twenty minutes to half an hour, came down and met her father.   He noticed that her face was flushed when she came down.   She immediately went to First Avenue South, took a car, left her father, and went to the defendant's sanatorium, No. 2200 Nicollet avenue.   She took with her a small satchel, containing a nightdress and other articles.   Before taking the car she had a conversation with her father, and showed him a card giving the defendant's name and address.   The next day, December 7, the father saw defendant at his

office, got a permit from him, and went to the defendant's sanatorium. He found his daughter in bed, in charge of a nurse. He had a conversation with his daughter. She cried, and directed her father to take some letters from her grip. These letters were written by the defendant and referred to the girl's pregnant condition. He took the letters away. The next day, Thursday, he went to the sanatorium, and was told that he could not see his daughter. He called again Saturday and was admitted to the kitchen, but not permitted to see his daughter. The father then went to defendant's office, arriving there about five o'clock. He saw defendant and inquired how Hilda Rosen was. Defendant said Hilda was dead, and her body was at an undertaker's office on Seventh street. Defendant made no answer to the question asked by the father as to what sickness caused the girl's death. Defendant said he would give the father back the money paid to him by the girl; that he would give $75 to assist in paying the expense attending the removal of the body to Two Harbors for burial. The above is the father's testimony.

Late Friday night, December 9, defendant telephoned to one Landis, an undertaker, to come to defendant's house, No. 2200 Nicollet avenue, in the city of Minneapolis, and take away a dead body. Landis went to the house, and in a room found the body of a young girl lying on a bed, with a sheet over it. Rigor mortis had already set in. Defendant told Landis to take the body away and care for it; that it was to be shipped out of the city to Two Harbors. The undertaker took the body to his rooms and immediately embalmed it. The next morning the undertaker again embalmed the body. Defendant afterwards furnished the undertaker with a death certificate which read as follows:

Medical certificate of Death.

Dec. 9, 1904.

I hereby certify that I attended deceased from Dec. 6, 1904, to Dec. 9, 1904; that I last saw her alive on Dec. 9, 1904; and that death occurred on the date stated above, at 11.30 p. m. The cause of death was as follows: Catalepsy. Duration, one day. Contributory neurasthenia.

Dec. 10, 1904.                    [Signed]    T. H. Bly, M. D.

The undertaker filed the certificate with the city health authorities, and in endeavoring to secure a permit to ship the body out of the city was instructed by the health officer to hold the body until an official inquiry could be made as to the cause of the girl's death.

On December 12, 1904, by direction of the coroner of Hennepin county, two physicians held a post mortem examination of the body. The internal organs were bleached and shrunken from the effects of a large quantity of embalming fluid. The nutrition of the body was found to be good, and it was fairly well nourished. On such examination, the physicians were of the opinion that the girl had been pregnant; that there had been a foetus in the womb from 3½ to 5 months old; that the foetus had been expelled from the womb from one to five days before death; could not fix definite time. Evidences were found of a recent abortion. The external opening of the vagina was extended, the uterus was enlarged in size, as is usual in case of pregnancy, and internally were evidences of the attachment of a placenta, also blood clots and shreds of tissue, the same being fragments of afterbirth. The blood vessels of the uterus were enlarged and full of blood clots. The blood clots and fragments of afterbirth found in the uterus were fresh and of normal appearance. The uterus was removed at the examination and preserved in alcohol. The physicians had considerable difficulty in arriving at the cause of death. Clots or "thombi" were found enmeshed in the fiber tendons attached to the valves of the heart. The immediate cause of death the physicians finally determined was clots of blood in the heart. No further investigation was made as to what caused the heart clots. In the examination of the body no evidences of catalepsy or neurasthenia were found, and there was nothing in the condition of the body to indicate any necessity for a procured miscarriage. The bladder and kidneys were normal, except for a small cyst found in the right kidney. This did not cause death. A microscopical examination was made of the uterus by Dr. White, who found evidences of a recent pregnancy. It was greatly thickened, and internally there were marks of the attachment of a placenta that had been removed, leaving the open sinuses, as is usual in case of the removal of the placenta upon the birth of a child. The uterus was severely inflamed; the walls filled with blood. The sinuses contained

clotted blood. Inflammation and evidences of sepsis were found everywhere through the walls of the uterus.

Testimony was given by the physicians on behalf of the state tending to show that a procured miscarriage could be brought on by the use of an instrument introduced into the womb, or by the introduction of a foreign body into the womb, bringing on a violent contraction of the uterus and the expulsion of the fœtus; that an instrument could be so used and leave no trace or indication of the use of the instrument on the body; that sepsis could arise from infection by the use of any instrument introduced into the womb, and the woman die from the septic condition within two or three days after the infection; that by a microscopical examination of the uterus the presence of sepsis could be detected; that the condition of the uterus, as found upon examination, showed sepsis took place before the death of the woman. The above covers the case for the state.

On the trial the defendant did not take the stand. The defendant's wife testified that Hilda Rosen came to the Bly Sanatorium about four o'clock in the afternoon of December 6, 1904, and rang the bell. Mrs. Bly let the girl into the house and showed her to a room on the second floor. The girl threw her hat on the bed and laid down. Mrs. Bly left her in the room. Mrs. Bly said she did not learn the name of the girl until after her death; did not know she was coming; did not know where she came from; had no word from Dr. Bly in relation to her.

Bessie Gibbons, a nurse, who lived with Dr. Bly, testified as follows: That she came home about 5 o'clock in the afternoon of December 6, 1904. Mrs. Bly told her she had a patient upstairs. She found Hilda Rosen on the bed asleep. She awakened her, assisted her to undress, and put her to bed. Dr. Bly came home about six o'clock. He simply looked at the girl and felt her pulse. He prescribed cold cloths on the head, cold baths, acetate of potassium, and quinine. December 7 and 9 the girl slept the greater part of the day; same treatment continued. December 9, evening, the girl's limbs were very cold. Dr. Bly and witness put extra comforts on the bed and used hot water bags. The girl rolled her head from side to side, and was muttering. Her limbs stiffened; she stopped breathing; she was dead. This witness told the jury that from the time Hilda Rosen came to Bly's house until her

death she slept nearly all the time, both day and night, and refused all food.  This witness swore that the father had no conversation with Hilda Rosen when he saw his daughter at Bly's Sanatorium, and there was no satchel in the room.

The defense lays great stress upon certain incidents as proof that the visit to Minneapolis on December 6 was not for the purpose of keeping an engagement with defendant, but that Mr. Rosen and his daughter left Two Harbors, she for the purpose of visiting her aunt in St. Paul, and he for that purpose as well as to see a land agent in Minneapolis, and that the visit to defendant's office was incidental; the miscarriage having occurred on the train down or prior to leaving Two Harbors.

Mr. Rosen's conduct is somewhat inconsistent.  If he knew of his daughter's condition and the purpose of her visit to Minneapolis, he attempted to conceal it.  If he stated to the witness Wikestrom that his daughter was sleepy and sick upon the train going down, such statement would be consistent with his purpose to conceal the crime.  However, he denied she was sick upon the train, and practically denied that he had so stated.

The credibility of this testimony was for the jury, and when the whole case is considered—her previous good health; the correspondence, absolutely unexplained: "Sanatorium for women before and during confinement; everything confidential;  *  *  *  will send you the medicine in a little box to-day; if it should fail you would have to come here for a guaranteed cure."  "If you are not too far advanced, I will take your case and see you through for $75."  Later the amount was raised to $100, upon learning that she was four and a half months advanced (there is no pretense that the correspondence referred to anything else than the getting rid of the unhappy girl's unwelcome burden); the fact that she immediately visited defendant, with whom she had the correspondence, and that she was at once directed by him to his private sanatorium, and that from the moment she left his office her condition changed and from a well woman she became an exceedingly sick one; the fact that she died within three and a half days, and that immediately after her death she was turned over by defendant to an undertaker, who, almost before her body was cold, charged it with poisonous fluids, which might prevent a critical examination of the cause of death, a proceeding entirely unnecessary to preserve the body

under the circumstances; the fact that a death certificate was made out by defendant, which, according to the post mortem examination, was false; the fact that the post mortem examination showed to the satisfaction of competent physicians that an abortion had recently taken place—all of these facts point direct to the defendant's guilt and are unquestionably sufficient to sustain the verdict of the jury. ·

The witness Emma Wikestrom was called by the defense and testified that she had resided at the village of Two Harbors; that she had been acquainted with Hilda Rosen about two years prior to her death; that she had a conversation with her about December 1, 1904, in which Hilda Rosen stated her condition. The witness was then asked this question:

> Now, Miss Wikestrom, I want you to tell this court and jury what Hilda Rosen said to you at that time about physical condition, and what you said to her, in full.

This was objected to, and the defense then made the following offer:

> Mr. Penney: I offer to show by this witness, and possibly by other witnesses, that four or five days before the fifth day of December, 1904, Hilda Rosen, the deceased, met this girl in Norby's drygoods store in Two Harbors; that during the conversation then had between these two Hilda told her [this witness] that she was in trouble; that the witness then asked her, "What is the matter?" and she said she thought she was in a family way; that the witness then said to her, "You may be mistaken," to which · Hilda Rosen replied, "I thought so myself for some time, but now I know I am in a family way," and this witness answered, "I am very sorry." Then she said she had been trying to get rid of it, and asked this witness if she knew any way she could get rid of it. The witness answered, "No, I don't know anything about such things." Then Hilda Rosen stated to this witness that she had been to Duluth to see a doctor; that she had got medicines from St. Paul, but that the medicines had no effect upon her at all, and she said, "I know what to do," and I believe added, "I am going to do it."

The objection to the offer was sustained, and we think no error was committed in so doing. Its admissibility is asserted on the ground that

it was a part of the res gestæ. The position of the defense is that there was a substantial controversy before the court as to whether the operation, if any there was, or if a miscarriage took place, it was prior to her visit to defendant at his office in Minneapolis, and that a declaration by her within five days from the time she left Two Harbors as to what her condition was, that she had been to Duluth to see a doctor, and that she had received medicines from St. Paul, characterized her conduct, making it consistent with defendant's theory, and thus tending to throw light upon the question at issue.

There was no evidence that she had visited Duluth at any time, and it could very easily have been ascertained if she had been there at least within a short time prior to December 5. Consequently the inference which defendant seeks to have drawn that she may have been criminally treated by a physician at Duluth has no substantial foundation. It does not tend to indicate that she had been in Duluth to see a doctor for such a purpose, or that any such result was accomplished there. The statement that she received medicine from St. Paul is immaterial, because the evidence is undisputed that she had received drugs and medicine from defendant at Minneapolis. At any rate, the effect of such medicines is negatived by her own statement contained in the offer that the medicine had no effect. So far, then, as the declarations are concerned, it amounted to no more than stating to an acquaintance what her true condition was and that she knew what to do. Her declaration that she knew what to do was consistent with her subsequent visit to defendant's office, and with no other conduct between those dates. Having left Two Harbors December 5, and immediately gone to defendant's office at Minneapolis, it conclusively follows that such visit was made pursuant to the arrangement mentioned in the correspondence. The words of the closing paragraph of the offer cannot be considered, for it is not an offer to prove an actual fact. We are not prepared to say that the court would not have been justified in receiving the testimony embraced in the offer. Such declarations are generally within the discretion of the trial court, and in this instance was not so immediately and necessarily connected with any fact at issue as to make its exclusion error.

The witness Bessie Gibbons, for the defense, being under examination and having testified that the defendant came to the sanatorium

about six o'clock on the evening of December 6, and that she went into the room where the girl was, was then asked the question:

> Did he say anything to you there in the girl's presence regarding the condition of this girl before he had made any examination of her in the bedroom?

Objection having been sustained, the defense then made the following offer:

> I offer to show by this witness that Dr. Bly, when he came home at six o'clock that night, said to the witness that this girl was in a very serious condition; that afterwards when Dr. Bly and the witness were together in this girl's room, he made substantially the same statement to the girl and to the witness, that she was a very sick girl.

The witness Gibbons had testified to the appearance and condition of the girl and as to what took place in her presence; but we are unable to see what particular bearing the defendant's statement, that she was a very sick girl, would have upon the issues of the case. It is open to very serious doubt whether such declaration can in any way be considered a part of the res gestæ, or admissible upon any ground. It conclusively appears from the evidence that Hilda Rosen was a terribly sick girl, and the fact that defendant recognized it when he entered the sick room and so expressed himself can throw no light upon the issue, and, while it might have been perfectly proper to admit the statement in evidence, we find no error in ruling it out.

The trial court submitted to the jury in a clear and comprehensive statement the issue presented by the evidence under the indictment. It covered all of the essentials of the crime necessary to be established by the evidence, and is without error.

Order affirmed.