## STATE v. T. EUGENE THOMPSON.*

139 N. W. (2d) 490.

January 7, 1966—Nos. 39,343, 39,702.

*Certified to U. S. Supreme Court April 18, 1966.

2

*C. Paul Jones* and *T. Eugene Thompson,* pro se, for appellant.

*Robert W. Mattson,* Attorney General, *William B. Randall,* County Attorney, and *Henry W. Pickett, Jr.,* Assistant County Attorney, for respondent.

KNUTSON, CHIEF JUSTICE.

Defendant was convicted of first-degree murder and appeals from an order denying his motion for a judgment of acquittal notwithstanding the verdict or for a new trial; from a supplemental order denying his motion for a new trial on the grounds of newly discovered evidence; and from the judgment of conviction.

The conviction resulted from the brutal murder of defendant's wife, Carol Thompson, on March 6, 1963, admittedly by one Dick W. C. Anderson.

At the time defendant's wife was killed defendant was a practicing attorney of some prominence in the city of St. Paul. He was admitted to the bar in 1955 after having attended Macalester College from 1946 to 1950 and the St. Paul College of Law from 1951 to 1955. After working at some jobs that are not of importance here, he began practicing law and was quite successful, mainly in the fields of personal injury, domestic relations, and criminal law. He was very active in bar association activities and did some teaching at the William Mitchell College of Law.

While attending Macalester College defendant met and married his wife. They have four children, a son born in 1949, and three girls born in 1951, 1953, and 1956. The family moved into the home in which they were living at the time of Mrs. Thompson's death in 1958. The home is located at 1720 Hillcrest Avenue in St. Paul. Both defendant and his wife were active in many community affairs and in their church. Defendant had served as an elder and a trustee of his church. So far as the record shows, their married life was harmonious and they seemed to get along well together, taking many trips with each other.

During the summer of 1960 defendant commenced a social relationship with one Jacqueline Okoneski whom, to begin with, he had represented in a divorce action. The relationship continued on a fairly regular basis until December 1961, and included dinner dates, visits by defendant to her apartment, some trips to out-state motels, frequent trips to a lake home at Forest Lake, Minnesota, owned by Carol's father, and one trip to Chicago. During 1961 Jackie attended a business school. She paid the tuition and expenses with money borrowed from defendant and upon her completion of this study was employed by defendant as a secretary. She repaid the money borrowed to pay for her education. In December 1961 Jackie began dating one Ronald Olesen, and early in 1962 returned a ring to defendant which he had given her shortly before that time. In the month of January 1962 Jackie terminated her employment with defendant's law firm. After December 1961 she dated defendant only a few times and on those occasions indicated that she was interested in marrying Ronald Olesen. She testified that in February 1962 defendant asked her if, before she made a final decision, she would give him a year or 11 months to get his financial affairs straightened around so as to ar-

range for the financial well-being of his family, but that she refused to do so. It appears that after the early part of 1962 Jackie saw defendant only a few times, for business purposes. In June 1962 she married Ronald Olesen. Sometime later in the summer of 1962 she came to defendant's office to discuss with him obtaining a divorce from Olesen, and papers were drawn to commence a divorce action. According to Jackie, she had lunch with defendant during the summer of 1962 and he asked her if she would marry him if he put $10,000 in the bank in her name, but she replied in the negative. In September 1962 Jackie's divorce action was commenced by defendant. The papers were personally served upon Olesen by defendant. It appears that in October 1962 a reconciliation was contemplated and defendant requested a friend of Jackie's to discourage her from such reconciliation with her husband. It does appear that in November 1962 Jackie and her husband were reconciled and living together. Defendant called her a few times and in December 1962 he had some harsh words with her husband, who would not permit defendant to speak with Jackie. She testified that sometime shortly after Christmas 1962 defendant called her at her work and asked her if she would be interested in taking an apartment in a building he owned, but that she refused. This appears to be the last time he contacted her prior to the death of Mrs. Thompson.

In January 1962 defendant and his wife traveled to Chicago and visited with acquaintances by the name of Mr. and Mrs. Bruce Gove, whom they had known since their days at Macalester College. Mr. Gove was in the insurance business and after being informed that Carol Thompson had very little insurance on her life he strongly urged Thompson to purchase some such insurance. He recommended a $50,000 ordinary life policy. Upon their return to St. Paul defendant had a conversation with his regular insurance agent, James Treanor. Inquiry was made about term insurance, and as a result of this interview and further negotiations defendant purchased insurance, much of which was term insurance with accidental death benefits, or purely accidental death insurance. This brought the aggregate insurance on her life to $1,061,000. The attached chart shows the amount and nature of the term insurance and the time it was purchased.

Defendant explained to Treanor and testified at the trial that his desire for this amount of insurance was based on the fact that if he died first his wife and children would have approximately $1,000,000 to live on by combining the insurance he carried on his life, which amounted to some $460,000, and an anticipated $500,000 inheritance she would receive from her father, a successful plumbing contractor of considerable wealth. Defendant testified that in order to have an equal amount for himself and his children if Carol should die first he purchased this insurance, amounting to somewhat over $1,000,000. He also stated that he had reached a position in life where he could easily afford it out of an unneeded monthly retainer which he received from the company owned by Carol's father. He stated that he had a premonition that his wife was going to have a tragic accident on February 8 or 9, 1963, and that he had had such premonitions previously when his brother and sister had died unexpectedly.

In July 1962 defendant was contacted by one Norman Mastrian in connection with a possible false arrest of Mastrian in Anoka. Mastrian had attended Macalester College about the same time as defendant, but it appears that defendant did not remember him from those days. On July 31, 1962, defendant agreed to represent Mastrian if he were paid a retainer of $2,500. Mastrian had no such money but did own stock in Telostat Corporation. Defendant agreed to take 1,000 shares of the stock in lieu of his retainer, but the company refused to make the transfer in that manner, so defendant paid Mastrian $2,500 in cash and then immediately took it back, as well as the stock. Further negotiations led to the purchase of the remaining 2,200 shares of stock in this company owned by Mastrian, for which he paid $1.25 a share, or a total of $2,750. Defendant testified that he was interested in acquiring controlling interest in the Telostat Corporation. On December 31, 1962, he had ascertained that the stock was virtually worthless and sold all of his stock to the president of the company for $800.

It appears that from August 1962 through February 1963 defendant met Mastrian in various places and spoke to him on the telephone on numerous occasions. During this time he was admittedly representing Mastrian in several legal matters.

Up to this point, there is not much dispute in the evidence.

The conviction rests upon an alleged conspiracy between Thompson and Mastrian to commit or procure someone to commit the murder of Mrs. Thompson. The evidence relating to this conspiracy is much in dispute; but briefly the testimony of witnesses, if admissible, would justify the jury in believing that the following acts transpired:

Prior to January 24, 1963, the Thompsons had a dog in their home which would bark when someone came to the house. On that date defendant took the dog to a veterinarian and asked him to find a new home for the dog. It was his claim that they had installed new carpeting in the home in January and that they had been unable to train the dog, so that she had stained the previous carpeting and they felt they had to get rid of her in view of the new carpeting. There was some dispute in the evidence as to whether Carol knew why the dog was given away or concurred in getting rid of her.

It was also shown that the portable telephone, often kept in the bedroom upstairs, was removed on March 4, 1963. Defendant claimed that it was removed because they wished to exchange it for a color telephone more in harmony with the new decoration in the house. The telephone was found in defendant's car after Mrs. Thompson had been assaulted.

In late February 1963 Mastrian began looking for someone to commit a murder for hire. One Sheldon Morris testified that in late February 1963 he was present when Mastrian asked one Richard Sharp if he would commit a murder for $2,000, to which Sharp replied that he was not interested but he knew a man by the name of Bill Ingram who might be interested. Morris testified that he was present when Mastrian asked Ingram if he was interested in killing a woman for $2,000. Ingram said he was not interested. Morris then testified that on March 2, 1963, Mastrian asked one Henry Butler if he would take the contract, but that Butler declined. Morris further testified that on the morning of March 4, 1963, Norman Mastrian told him that he had to go to meet defendant at a pancake house in St. Paul, and that Mastrian borrowed his car that same evening to meet Thompson in the parking lot behind McGuire's Restaurant.

Richard Sharp testified that he had been offered a job by Mastrian to kill a churchgoing woman with four children and that Mastrian had sug-

gested that it be done by hitting her with a rubber hose and then drowning her in the bathtub. He was told that she was heavily insured and that the price for the job would be $2,000 unless it looked like an accident, in which case it would be $3,000. Sharp then testified that on or about March 2, 1963, he introduced Mastrian to Dick Anderson, and that he, Sharp, was present on March 3 when Mastrian offered the job to Dick Anderson, who replied that he would think about it. He testified that on March 4 he gave the gun to Mastrian that was used 2 days later in the beating of Carol Thompson.

Willard Ingram testified to the conversation that he had with Mastrian and corroborated the testimony of Morris and Sharp.

Henry Butler testified that he had been offered a job of killing by Mastrian and that he was present when Mastrian gave the gun to Anderson; and that on March 4 or 5, 1963, he had heard Mastrian ask Anderson, "What happened today? I had a perfect alibi."

Dick W. C. Anderson then testified that he met Mastrian on March 3, 1963, and that Mastrian asked him on that day if he was interested in killing a woman, to which he replied that he would think about it. He testified that later that same day Mastrian called him, and at that time Anderson said he would take the contract to kill the woman, but he would have to have half the money, $1,000, before he did the job. Anderson then testified that Mastrian arranged to meet him on the evening of March 4 and at that time told him that he could get only $200, but that he would get the rest by the following Friday. Anderson testified in detail as to how the killing was to be done. He then said:

"This was the first time I had heard the name of Mr. Thompson. He [Mastrian] says, 'Mr. Thompson will leave the door open in the morning.' Says, 'You will be able to go inside and go down in the basement and wait.' Says, 'At 8:25 Mr. Thompson will call Mrs. Thompson and,' he says, 'at that time you will be able to sneak up the stairway.' He says, 'Mrs. Thompson will be right around in the kitchen answering the telephone. The other telephones in the house will be removed so that she has to come downstairs.' "

Anderson testified that they then picked up a hat for Anderson to wear while doing the job, and then proceeded to St. Paul, where:

"We went over to the Highland Park area and he drove me past the residence at 1720 Hillcrest in the front. He says, 'Look good at the front of the house.' I did and then we went around the alley and we made several trips around the alley and around the front of the home. Then we finally pulled up in front of the home and then I—he showed me the side door, pointed it out to me and said that there is no back door on the residence. He says also at 6:00 o'clock in the morning there is no movement around on the streets and that there is no lights on in this section. And then I asked him about coming out in the morning, this side door, I asked about the people that lived next door to the east of the Thompson residence. He told me there was a widow lady that lived there and she didn't get up early in the morning and she also slept on the opposite side of the home. He says, 'You won't have to worry about anybody seeing you as you come out in the morning.'

"* * * At that time he took a rubber hose out from underneath the front seat of his car and he told me that the woman should be hit at an angle across the back of the neck to more or less simulate falling in the bathtub. I asked him about the water in the bathtub and he said, 'Mr. Thompson will leave water in the bathtub.' I discussed further with him about the body, whether it should be face down or up if she fell in the bathtub. He said, 'Be sure and have it so the body is up as far as the bathtub goes,' and he instructed me as far as reverse artificial respiration on the chest."

Anderson also testified that when questioned Mastrian admitted that insurance was involved and that Mastrian drew diagrams of the house so that he could find his way around; that they purchased rubber surgical gloves; and that Mastrian took him home, gave him a rubber hose and the hat, and said he would call that night. He testified that Mastrian did call him about midnight on March 4 and told him that the job could be done on the morning of March 5, 6, or 7, but had to be done before March 8. He testified that Mastrian called him about 9:30 in the morning of March 5 and asked him if the job had been done and was informed by Anderson that he did not do it that morning and wanted a gun in case anything went wrong. He testified that Mastrian delivered a gun to him on March 5 and, after he had assured Mastrian that the job could be done the next morning, Mastrian said, "Well, I will have to see Mr. Thompson again

and see if everything will be in the clear"; that Mastrian called later on March 5 and informed him that everything was clear, and that he then proceeded to do the job.

Anderson testified in detail that he entered the house by the side door and hid in the basement until he heard Mr. Thompson and the children leave. The telephone rang and Mrs. Thompson came down to answer it. He said that the stairs going to the basement had squeaked when he came in so, rather than alarm her, he waited until she had returned to her bedroom and then went up and told her that he was looking for money and would not harm her. He told her to lie on her face, and when she did, he hit her at the base of the skull with the rubber hose as hard as he could, and carried her body to the bathtub where he intended to drown her by reverse artificial respiration, but she came to and escaped from him and ran back to her room. He said that he then tried to shoot her, but that the gun refused to fire, and that he hit her with it. She ran downstairs and tried to get out the front door, but it was locked with the chain latch which prevented her from doing so before he again struck her with the gun. He then took a knife from the kitchen and stabbed her in the throat, and the handle of the knife broke off, leaving the blade in her throat. He thought she was dead or dying and went back to the bedroom to create the appearance of an attempt to commit burglary. Then he heard the door shut downstairs and went down to find that Mrs. Thompson had gone.

It appears that after escaping from the home subsequent to the assault upon her by Anderson, Carol ran to the neighbor's house next door but was unable to get help there. She then ran to the home of Mrs. Ruth Nelson, where she collapsed after asking for help. She was asked, "Who did this to you?" and answered, "A man" before collapsing. The police were called and she was taken to Ancker Hospital, where she died about noon.

Anderson testified that after he found that Mrs. Thompson had gone he left the house by the front door and went back to his apartment where he received a call from Norman Mastrian. He put the clothing he had worn into a laundry bag and met Mastrian and Sheldon Morris and the three of them rode north of the Twin Cities and threw the clothing and

gun out of the car while driving along side roads. Anderson got out of the car at Anoka and took a cab back to Minneapolis.

Sheldon Morris testified that 2 days after Mrs. Thompson was killed he drove Mastrian to Forest Lake, where her father owned a cottage frequently used by the Thompsons. They parked the car and waited for about an hour and then drove back to Minneapolis. On the following night, March 9, and in the afternoon on March 10, this trip was repeated, and each time after waiting about an hour they returned. Morris testified that on March 15 he delivered $800 from Mastrian to Anderson, with the message that that was all the money Mastrian could raise at that time, and that Anderson should not bother him until he (Mastrian) could make contact with the payoff man. He testified that on or about March 15 an attorney, John Connolly, gave Morris 25 $100 bills, to be given to Mastrian, and that on April 15 he delivered an envelope from Mastrian to Anderson that was supposed to have $1,500 in it, with a message that it would be all the money Anderson could expect until Mastrian received his money from the payoff man. Anderson then informed Morris that he would be gone for about 2 weeks and wanted the rest of his money upon his return "or else." Before Anderson could return he was apprehended and arrested in Phoenix, Arizona, in connection with this crime.

It is not disputed that defendant arrived at his office on March 6 earlier than usual and shortly thereafter had his secretary call his home. She spoke to defendant's wife and then turned the telephone over to defendant, who informed his wife that he would be unable to return home early that afternoon as they had planned.

About 9:15 a. m. on March 6 defendant was informed by a son of Mrs. Ruth Nelson, the neighbor to whom Carol had gone for help after being attacked, that his wife had been stabbed and would be taken to Ancker Hospital shortly. Defendant left his office with an associate, Donald Kelly, and went immediately to the Nelson residence. Upon arriving there he found that Carol had been taken to Ancker, so they drove there. While at the hospital that morning defendant suggested to the police who were there that robbery might be the motive for the crime and suggested that they go to his home and look in the basement to see if quite a large sum of money he kept there had been taken. Later in the day

he spoke again to the police, and produced a briefcase which had been in his office in which were found 44 $100 bills. On March 8 defendant indicated a desire to withdraw $5,000 in cash from an account he had for the purpose of hiring private investigators, but was advised by his associate that it would be unwise to withdraw such money in view of the questions that had been raised about the insurance he had on his wife. On the same day he again spoke with the police and said the hose found in defendant's bathroom after the killing probably came from his lake home but he did not know how it came to be in the bathroom.

On March 20, 1963, defendant was contacted by attorney John Connolly, who was then representing Mastrian, and asked to bring certain files of Mastrian's to Connolly's office. In addition to the files defendant gave Connolly 25 $100 bills and said it was the return of the retainer which Mastrian had given him in connection with the matter in Anoka County. In the examination of defendant, he admitted he had done considerable work for Mastrian but had never had an accounting with him.

The venue of the case was ultimately changed from Ramsey to Hennepin County at the request of the defendant, and the case was tried there by a jury, commencing on October 28, 1963, and ending on December 6, 1963. Defendant was found guilty of murder in the first degree and sentenced to life imprisonment in the state penitentiary.

The appeal raises a number of questions, some of which must be considered separately from the others. In discussing them additional facts pertaining to each issue will be stated hereinafter. The assignments of error pose the following questions:

(1) Was the indictment based on competent legal evidence sufficient to sustain it?

(2) Was there sufficient proof of a conspiracy so as to render admissible against Thompson the hearsay statements of alleged coconspirators?

(3) Should the evidence procured by police officers in searching the Thompson home have been suppressed as the fruits of an unlawful search and seizure?

(4) Was it reversible error to deny defendant's motion for leave to examine a pretrial statement of a prosecution witness?

(5) Was misconduct of a juror in reading newspaper articles concerning the trial grounds for a new trial?

(6) Was defendant denied a fair trial due to publicity given the case?

(7) Does the evidence as a whole sustain the conviction?

(8) Was it error to deny a new trial based on newly discovered evidence pertaining mainly to a repudiation by Anderson of his testimony at the trial?

## MOTION TO QUASH INDICTMENT

■ Defendant moved to quash the grand jury's indictment on the ground that it was not based on competent evidence. The case was first submitted to a grand jury that failed to indict. Thereafter Anderson confessed and the case was submitted to another grand jury, which did return an indictment. Defendant's argument is that inasmuch as the minutes of the clerk of the grand jury failed to show that Anderson appeared before it, his confession must have been related to the grand jury as hearsay by others and that an indictment based on such hearsay cannot stand.

The statutory provisions involved are Minn. St. 628.59, which reads in part:

"In the investigation of a charge for the purpose of indictment * * *, the grand jury shall receive no other evidence than:

"(1) Such as is given by witnesses produced and sworn before it; and

"(2) Legal, documentary, or written evidence.

"It shall receive none but legal evidence, and the best in degree to the exclusion of hearsay or secondary evidence, except when such evidence would be admissible on the trial of the accused for the offense charged,"

and § 630.18, which, so far as material here, reads:

"The indictment shall be set aside by the court in which the defendant is arraigned, upon his motion, in any of the following cases:

"(1) When it shall not be found, endorsed, and presented as prescribed in sections 628.41 to 628.67 relating to grand juries."

Very few of our cases deal with the quashing of an indictment due to the insufficiency of the evidence to sustain it. Obviously, an indictment based only on incompetent evidence ought to be quashed. The question arises at what point the indictment becomes subject to a motion to quash when

there is some competent evidence before the grand jury. We have held that an indictment will not be quashed because some incompetent evidence comes before the grand jury if there is sufficient competent evidence to sustain it. State v. Marshall, 140 Minn. 363, 168 N. W. 174.

In State v. Ernster, 147 Minn. 81, 179 N. W. 640, we did remand with directions to quash the indictment, but it is somewhat difficult to determine from the opinion whether this was based on the insufficiency of competent evidence or on the presence in the grand jury room of persons who had no right to be there. We said (147 Minn. 83, 179 N. W. 640):

"* * * We have * * * held that the fact that hearsay or illegal evidence was heard and considered by a grand jury is not sufficient ground for quashing an indictment, for there may have been other and competent evidence received to warrant its finding. State v. Marshall, 140 Minn. 363, 168 N. W. 174. * * *

\* \* \* \* \*

"* * * Here evidence, illegal or hearsay, to be sure, was given the grand jury and the case was discussed when persons not authorized to be present were present. The minds of the jury must have considered and laid hold of the case when they heard what purported to be the facts or evidence in respect to it. On the testimony above referred to we think it clearly appears that the indictment should have been quashed.

"* * * It is supposed that witnesses only shall appear, one at a time, and give competent evidence, and upon evidence so given, and that alone, the jury are to determine whether a person should be accused of crime."

The grand jury system is deeply embedded in the criminal law in this state. The Bill of Rights in the United States Constitution and the laws of Minnesota contain provisions requiring grand jury indictments in the more serious cases. A grand jury proceeding has long been held to be basic to the rights of an accused. See McClintock, *Indictment by a Grand Jury,* 26 Minn. L. Rev. 153, for a history of the grand jury system. An indictment by a grand jury is intended for the protection of the accused, and many formal requirements have been enacted by statute to govern the procedure by which a valid indictment may be found. Among these is the

requirement that an indictment must be based upon legal evidence. This provision should be construed in favor of the accused when the evidence shows a violation thereof. The difficulty is in ascertaining upon what evidence the grand jury based its decision.

In the case now before us, while the suspicion that the second grand jury was influenced by hearsay coming from the lips of others after Anderson had confessed seems reasonable, there is no proof of it. In the nature of things, the burden of showing upon what a grand jury based its decision is a heavy one, and probably in many cases cannot be met. Obviously, if its deliberations are to remain secret, as is intended, in determining whether the indictment is based on competent evidence or not, much must be left to the trial court; and in order for us to reverse the trial court's decision after a trial and conviction, it must appear that incompetent evidence has so far influenced the grand jury that an indictment would not have been returned without it. Here, while it is true that the second grand jury, convened subsequent to Anderson's confession, returned an indictment where the first had not, it is entirely possible that Anderson's confession led to discovery of other competent evidence not available to the first grand jury. Under all the circumstances we think the trial court correctly denied the motion to quash the indictment.

### Hearsay Testimony Of Alleged Coconspirators

■ One of defendant's principal assignments of error relates to the admission of the testimony of Morris, Sharp, Ingram, Butler, and Anderson concerning their dealings with Mastrian in his effort to procure someone to kill Mrs. Thompson. It is conceded that the admissibility of hearsay testimony of these witnesses depends upon the establishment of a conspiracy to which Thompson was a party. It must also be conceded that without the hearsay testimony of these witnesses the conviction of Thompson would be difficult to sustain.

The rule under which such testimony becomes admissible once a conspiracy is established is probably as well stated in State v. Dunn, 140 Minn. 308, 317, 168 N. W. 2, 6, as anywhere. The facts in that case are strikingly similar to those here so far as execution of the crime is concerned. We there said:

"* * * [A] conspiracy being established, the acts and declaration of any one of those in the conspiracy, made thereafter in the furtherance thereof, is proper evidence in the trial of any one of the coconspirators, whether present or absent. [Citations omitted.] The crime for which appellant was being tried was murder and not conspiracy; but the existence of a conspiracy to murder was an evidentiary fact tending to prove appellant's connection with the crime charged. It was not therefore necessary to prove the conspiracy beyond a reasonable doubt, prima facie proof was all that was required to let in evidence of a coconspirator's acts and declaration, done or made in furtherance of the common purpose, to implicate any other coconspirator."

The same rule is followed in State v. Evans, 88 Minn. 262, 92 N. W. 976; State v. Tennyson, 212 Minn. 158, 2 N. W. (2d) 833, 139 A. L. R. 987; State v. Connelly, 249 Minn. 429, 82 N. W. (2d) 489; State v. Guy, 259 Minn. 67, 105 N. W. (2d) 892. The distinction must be kept in mind between proving a conspiracy as a crime, where proof beyond a reasonable doubt would be required, and establishing a conspiracy as a prerequisite to the admission of statements of alleged coconspirators, where a prima facie showing is sufficient. State v. Guy, 259 Minn. 75, 105 N. W. (2d) 899.

The responsibility for determining whether a conspiracy has been sufficiently established to admit hearsay statements of coconspirators rests in the first instance with the trial court. State v. Guy, *supra.*

The conspiracy need not be, and seldom is, established by direct proof. The existence of the conspiracy may be inferred from other proven facts and circumstances. State v. Kahner, 217 Minn. 574, 15 N. W. (2d) 105, certiorari denied, 323 U. S. 768, 65 S. Ct. 121, 89 L. ed. 614. It may be proved by circumstantial evidence. Nathan v. St. Paul Mutual Ins. Co. 251 Minn. 74, 86 N. W. (2d) 503. See, also, Nilva v. United States (8 Cir.) 212 F. (2d) 115. The existence of a conspiracy may not be proved by the hearsay statements of the alleged coconspirators, and ordinarily such statements should not be admitted until a prima facie showing of the existence of a conspiracy is made, but some latitude must be allowed the trial court in determining the order of proof. Nathan v. St. Paul Mutual Ins. Co. *supra;* 3B Dunnell, Dig. (3 ed.) § 1566a.

Where an examination of the record as a whole shows facts from which the trial court could reasonably infer the existence of a conspiracy, the case ought not to be reversed because proof of the conspiracy came at the wrong time. Often, as here, the overt acts of the alleged co-conspirators may go partly to the establishment of the conspiracy. If inadmissible statements are admitted out of order and it develops that no sufficient showing of a conspiracy has been made, the court ought to strike the statements on motion; and if the case cannot stand without them, proper relief ought to be granted at that time. See, 4 Wigmore, Evidence (3 ed.) § 1079; Annotation, 91 A. L. R. (2d) 1148, 1197; 16 Am. Jur. (2d) Conspiracy, § 38.

Tested by these rules, was the evidence here sufficient to establish prima facie a conspiracy? The term "prima facie" in this context is rather a nebulous one that defies exact definition. It can probably be defined only in terms of sufficient evidence to permit the trial court reasonably to infer that there existed a conspiracy. It is generally accepted that "[w]hen two or more persons agree or combine * * * to accomplish a criminal or unlawful purpose * * *, a conspiracy exists." 3 Underhill, Criminal Evidence (5 ed.) § 855.

Looking at the evidence in this case, we have, as establishing prima facie a conspiracy, the rather unusual amount of insurance taken out shortly before the murder was committed, of a type that would expire for the most part shortly after the date of the murder, and a large part of which was payable in the event of accidental death of the insured. The policies were all owned by the beneficiary. We have the defendant's affair with Jackie and his apparent desire to continue it, if we believe her testimony; his numerous contacts and telephone conversations with Mastrian; removal of a dog that might have sounded a warning, shortly before the commission of the crime; removal of a telephone that made it necessary for Mrs. Thompson to go downstairs to answer the telephone; the early appearance of defendant at his office on the fatal day and the previous day when the crime could have been committed; his stock transactions with Mastrian, resulting in a substantial loss to defendant and quite a gain to Mastrian; the locking of the front door, which was unusual; defendant's intention to withdraw $5,000 from his bank account,

and the prior possession of a large amount of cash, of which $2,500 was returned to Mastrian by Mr. Connolly, without deduction of any portion thereof for the services rendered by Thompson. There is much evidence explaining many of these actions. The removal of the dog was quite satisfactorily explained by showing that new carpeting had been placed in the hall and that the dog had stained the former carpeting. Removal of the telephone was also quite satisfactorily explained by showing that due to redecorating of the home another type of telephone was desired. While there are many things that cast doubt upon some of the evidence that would go to establish conspiracy, there is enough, we think, to permit the admission of hearsay statements of the witnesses involved for the purpose of connecting defendant with the conspiracy. These statements came from the mouths of individuals who, to say the least, left much to be desired as contemplated conspirators, even in crime, but the weight and credibility of their testimony was for the jurors, who had the chance to observe them and to evaluate the truth of what they were saying.

### SEARCH AND SEIZURE

■ The police arrived at the Nelson home, where Mrs. Thompson had gone for help, at about 9:15 a. m. After they learned who she was, they entered the Thompson home to search for a possible assailant. Finding no one, they left the house. About an hour later, other officers from the police department, including a criminologist, entered the Thompson house and made a thorough search of it. They found and removed certain items of property, including broken pieces of plastic that turned out to have come from the grip of the gun used to beat Mrs. Thompson; three cartridges for a gun of the same type as was used; a rubber hose; certain items of clothing; a jewel case; and a ring. They took numerous photographs of the interior of the house while there.

Defendant, prior to trial, moved to suppress this evidence as illegally seized in contravention of the Fourth and Fourteenth Amendments to the United States Constitution and art. 1, § 10, of the Minnesota Constitution. The motion was denied.

At the time of the search and seizure, defendant was not suspected of any complicity in the crime. The parts of the gun found on the premises

ultimately led to the apprehension of Anderson. His subsequent confession may have led to the charge brought against Thompson; but at the time the search was conducted Thompson voiced no objection to it but on the contrary showed every indication of his desire to assist in the apprehension of the perpetrator of the crime.

The law of search and seizure has a long and interesting history and continues to develop and to be revised substantially from time to time. Without undertaking a comprehensive review of the decisions pertaining to this development, a reference to a few may be of help in coming to the proper conclusion as to whether the evidence seized here should have been suppressed.

Originally at least, the constitutional proscription against unreasonable searches and seizures was intended to prevent the invasion of a person's right to privacy in his home and effects. The original concept of the rule against unreasonable searches and seizures is probably best articulated in Boyd v. United States, 116 U. S. 616, 6 S. Ct. 524, 29 L. ed. 746, where, after reviewing preceding authorities, including the English case of Entick v. Carrington, 19 How. St. Tr. 1029, in which Lord Camden stressed the inviolability of a person's property, Mr. Justice Bradley said (116 U. S. 630, 6 S. Ct. 532, 29 L. ed. 751):

"The principles laid down in this opinion [Entick] affect the very essence of constitutional liberty and security. They reach farther than the concrete form of the case then before the court, with its adventitious circumstances; they apply to all invasions on the part of the government and its employes of the sanctity of a man's home and the privacies of life. It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offence; but it is the invasion of his indefeasible right of personal security, personal liberty and private property, where that right has never been forfeited by his conviction of some public offence,—it is the invasion of this sacred right which underlies and constitutes the essence of Lord Camden's judgment. Breaking into a house and opening boxes and drawers are circumstances of aggravation; but any forcible and compulsory extortion of a man's own testimony or of his private papers to be used as evidence to convict him of crime or to forfeit his goods, is within the condemnation of that judgment. * * *

"Can we doubt that when the Fourth and Fifth Amendments to the Constitution of the United States were penned and adopted, the language of Lord Camden was relied on as expressing the true doctrine on the subject of searches and seizures, and as furnishing the true criteria of the reasonable and 'unreasonable' character of such seizures?"

The basic doctrine stated in Boyd was reiterated in Weeks v. United States, 232 U. S. 383, 34 S. Ct. 341, 58 L. ed. 652.

While the Fourth Amendment originally protected against the invasion of the right of privacy, later cases have sought means of enforcing the right by deterring officials from violating the rule and by the extension to state criminal trials of exclusionary rules originally applicable only to Federal prosecutions. Thus, in Elkins v. United States, 364 U. S. 206, 217, 80 S. Ct. 1437, 1444, 4 L. ed. 1669, 1677, we find the court overruling the former doctrine that evidence obtained by state agents in an unreasonable search and seizure was admissible in a Federal criminal trial, where no Federal agent participated in the search and seizure. The court there said:

"* * * The rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way— by removing the incentive to disregard it."

In Mapp v. Ohio, 367 U. S. 643, 81 S. Ct. 1684, 6 L. ed. (2d) 1081, the court overruled Wolf v. Colorado, 338 U. S. 25, 69 S. Ct. 1359, 93 L. ed. 1782, which had held that the exclusionary rules applicable in Federal prosecutions did not apply to state criminal prosecutions. In so doing, the court said (367 U. S. 660, 81 S. Ct. 1694, 6 L. ed. [2d] 1093):

"The ignoble shortcut to conviction left open to the State tends to destroy the entire system of constitutional restraints on which the liberties of the people rest. Having once recognized that the right to privacy embodied in the Fourth Amendment is enforceable against the States, and that the right to be secure against rude invasions of privacy by state officers is, therefore, constitutional in origin, we can no longer permit that right to remain an empty promise. Because it is enforceable in the same manner and to like effect as other basic rights secured by the Due Process Clause, we can no longer permit it to be revocable at the whim

of any police officer who, in the name of law enforcement itself, chooses to suspend its enjoyment. Our decision, founded on reason and truth, gives to the individual no more than that which the Constitution guarantees him, to the police officer no less than that to which honest law enforcement is entitled, and, to the courts, that judicial integrity so necessary in the true administration of justice."

Finally, in Ker v. California, 374 U. S. 23, 83 S. Ct. 1623, 10 L. ed. (2d) 726, the court held that the question of reasonableness of a state search and seizure is governed by Federal constitutional standards as expressed in the Fourth Amendment and the decisions of the United States Supreme Court construing that amendment. There is therefore no longer doubt that in determining whether there was an unlawful search and seizure we must apply the present concepts of Federal constitutional law as expressed by the Supreme Court of the United States.

We come then to the question of whether defendant had standing to protest the use of the evidence seized. In Agnello v. United States, 269 U. S. 20, 30, 46 S. Ct. 4, 5, 70 L. ed. 145, 148, the court said:

"The right without a search warrant contemporaneously to search persons lawfully arrested while committing crime and to search the place where the arrest is made in order to find and seize things connected with the crime as its fruits or as the means by which it was committed, as well as weapons and other things to effect an escape from custody, is not to be doubted. See Carroll v. United States, 267 U. S. 132, 158; Weeks v. United States, 232 U. S. 383, 392. The legality of the arrests or of the searches and seizures made at the home of Alba is not questioned. Such searches and seizures naturally and usually appertain to and attend such arrests."

Should the rule be otherwise if, before the officers arrive, the perpetrator of the crime escapes, especially if the owner or occupant of the premises searched voices no objection to a search for evidence of the crime, who committed it, and the circumstances surrounding its commission? If he voices no objection to such a search, can the occupant of the premises searched later object if the search leads to the discovery of evidence that identifies the perpetrator of the crime, who in turn implicates the occu-

pant of the premises and charges him with complicity in the crime? We would think that if the search and seizure is lawful when made, it remains so, even though the occupant could have objected and required a search warrant at the time the search was conducted. A search warrant under the circumstances of this case would be a useless formality and in some such cases would impose an impossible impediment to investigation of a crime. There is no invasion of privacy where the search is with the express or tacit consent of the one who has the right to object.

With respect to the right of the occupant of a house to complain of unlawful search and seizure, the court in Agnello said (269 U. S. 32, 46 S. Ct. 6, 70 L. ed. 149):

"While the question has never been directly decided by this court, it has always been assumed that one's house cannot lawfully be searched without a search warrant, except as an incident to a lawful arrest therein. [Citations omitted.] The protection of the Fourth Amendment extends to all equally,—to those justly suspected or accused, as well as to the innocent. The search of a private dwelling without a warrant is in itself unreasonable and abhorrent to our laws. Congress has never passed an act purporting to authorize the search of a house without a warrant."

This language should, however, we think be construed in relation to the basic purpose underlying the constitutional proscription against unreasonable searches and seizures—that is, to protect against unlawful invasion of the privacy of a person's home or effects.

At the time of the search and seizure, the officers did not know for whom they were looking. They did not at that time suspect defendant of any complicity in the crime. The search was conducted as part of an investigation to ascertain who the assailant of Mrs. Thompson was. While there is no evidence of defendant's express consent to a search of his home, neither is there evidence of any objection. What evidence there is in the record indicated that he at least tacitly consented to the search and indicated his desire to cooperate with the officers in finding Mrs. Thompson's assailant. At that time there was no invasion of his privacy. The seized articles which became important in the trial were not even owned by him. They were instruments left by the perpetrator of the crime when

he escaped from the house and were brought to the scene by him. The search was wholly incidental to an investigation of the crime and an attempt to ascertain who had committed it. In Jones v. United States, 362 U. S. 257, 267, 80 S. Ct. 725, 734, 4 L. ed. (2d) 697, 706, the court said:

"* * * [A]nyone legitimately on premises where a search occurs may challenge its legality by way of a motion to suppress, when its fruits are proposed to be used against him. This would of course not avail those who, by virtue of their wrongful presence, cannot invoke the privacy of the premises searched."

The case now before us does not present the dilemma posed in Jones, where to admit ownership of narcotics seized so as to establish standing to assert illegality of its seizure would be an admission of guilt and undoubtedly result in conviction. Anderson was not on the premises lawfully and the evidence seized was used only to corroborate his testimony as the perpetrator of the killing.

If the prosecution had remained against Anderson alone, we think no one would question the validity of this search and seizure. He was clearly a trespasser. He had no right to be in the house and we doubt that he would have any standing to question the validity of the search and seizure made in investigating his crime. When, eventually, defendant was accused of complicity in the crime, it would seem that he could not then retroactively question the search which initially he had, at least tacitly, condoned. We think the evidence here sufficiently shows authorization of the search by the one entitled to object to it so that it cannot be said that the search and seizure were unreasonable.

Nor do we think United States v. Jeffers, 342 U. S. 48, 72 S. Ct. 93, 96 L. ed. 59, is in conflict with this conclusion. In that case the officers were searching for and seized property claimed by the defendant. To be sure, he was not the occupant of the premises where the goods were found, but he had a right to use the premises; he was not a trespasser. In such circumstances, he had standing to object to the search and seizure. Here Anderson had no such right, and defendant did not assert it at the time he should have if he had any objection. The search and seizure were unlawful at the time made in Jeffers. The opposite is true here.

In Jones v. United States, 362 U. S. 257, 261, 80 S. Ct. 725, 731, 4 L. ed. (2d) 697, 702, relied upon by the state, the court said:

"Ordinarily, then, it is entirely proper to require of one who seeks to challenge the legality of a search as the basis for suppressing relevant evidence that he allege, and if the allegation be disputed that he establish, that he himself was the victim of an invasion of privacy. * * * To establish 'standing,' Courts of Appeals have generally required that the movant claim either to have owned or possessed the seized property or to have had a substantial possessory interest in the premises searched."

The court then points out the fallacy in requiring possessory interest in the premises and nullifies that requirement by saying (362 U. S. 267, 80 S. Ct. 734, 4 L. ed. [2d] 706):

"* * * No just interest of the Government in the effective and rigorous enforcement of the criminal law will be hampered by recognizing that anyone legitimately on premises where a search occurs may challenge its legality by way of a motion to suppress, when its fruits are proposed to be used against him. This would of course not avail those who, by virtue of their wrongful presence, cannot invoke the privacy of the premises searched."

Taken literally, this language might be construed to mean that defendant could challenge the legality of the search and seizure at any time he was accused of the crime, even though he had not objected to the search and seizure when made. However, we think that would be going too far. The police officers ought to be given an opportunity to investigate a crime; and where the occupant of the premises permits a search to be made in order to ascertain who the perpetrator of the crime was, he should not thereafter be permitted to claim that objects found as a result of the search that are used in prosecution of the crime should be suppressed as the product of an unlawful search and seizure. Permitting the officers to make a search without a warrant at a time when the occupant of the premises is not even suspected of the crime lulls them into security. Thereafter excluding the objects obtained thereby on the ground that the search and seizure were unlawful is obviously unfair. After all, we get

back to the basic reason for the constitutional proscription— protection from unlawful invasion of a person's home or effects; if there is no such unlawful invasion, the evidence ought not to be excluded.

Our decisions in State ex rel. Branchaud v. Hedman, 269 Minn. 375, 130 N. W. (2d) 628, certiorari dismissed, 381 U. S. 907, 85 S. Ct. 1456, 14 L. ed. (2d) 289, and State v. Harris, 265 Minn. 260, 121 N. W. (2d) 327, certiorari denied, 375 U. S. 867, 84 S. Ct. 141, 11 L. ed. (2d) 94, are cited by both parties in support of their respective contentions. We do not think the cases are of much help here. The object of the search in both cases was an automobile, and there was reasonable ground to believe that defendant was involved in illegal activity. We were able to find consent for the search in the Branchaud case and in the Harris case relied on the distinction frequently drawn between search of an automobile and search of a home. An automobile is a movable object and frequently, if it is not searched when found, search will be of no avail. That is not true of a home, and the requirements for a search warrant, if a home is to be invaded, should be more strictly applied than if an automobile is the object of the search.

■ The state also contends that inasmuch as defendant did not object to the introduction of the items seized by the officers at the trial he cannot be heard to object to their admission now on appeal. The state relies on State, by Burnquist, v. Bollenbach, 241 Minn. 103, 63 N. W. (2d) 278, for the proposition that the court will not review objections made for the first time on appeal.

Defendant moved to suppress the evidence prior to trial. The motion was denied. He also moved to strike the exhibits taken from his home and the testimony of the criminologist who conducted the search. It would seem that where a motion to suppress is made prior to trial and denied a defendant has sufficiently preserved his record for appeal. He should not be compelled to thereafter object to the introduction of each item of evidence. He has brought his objection to the attention of the court and the court has ruled on it and that should be all that is necessary in order to preserve the objection for review. This is particularly true since the adoption of L. 1963, c. 850 (Minn. St. 626.21).

### DEFENDANT'S RIGHT TO PRETRIAL STATEMENTS OF
### PROSECUTION WITNESSES (THE JENCKS RULE)

■ The state called as one of its witnesses Floyd Peterson, an insurance agent. After he had been examined by the prosecution, defendant's counsel requested that he be permitted to examine a pretrial written statement made by the witness. The trial court ruled that he would examine the statement in camera to ascertain whether it was inconsistent with the testimony of the witness. Having done so he found there was no inconsistency and refused to permit defendant to have the statement. As to all other witnesses where such demand was made, the court examined the pretrial statements, and after inquiring of the prosecuting attorney whether there was any public policy against showing the statements to defendant's counsel and receiving a negative answer, ruled that they be furnished to the defendant. Defendant assigns as error the refusal of the trial court to permit him to see the Peterson pretrial statement, as well as the manner in which the other statements were handled.

We have no controlling decision in Minnesota on this question. We did come close to it in State v. Boerner, 267 Minn. 539, 127 N. W. (2d) 555. Prior to Jencks v. United States, 353 U. S. 657, 77 S. Ct. 1007, 1 L. ed. (2d) 1103, decided June 3, 1957, the courts were widely split as to how such pretrial statements should be handled. It is difficult to reconcile even the decisions of the United States Supreme Court. Compare, for instance, Gordon v. United States, 344 U. S. 414, 77 S. Ct. 369, 97 L. ed. 447, and Goldman v. United States, 316 U. S. 129, 62 S. Ct. 993, 86 L. ed. 1322. It would serve no useful purpose to discuss the cases prior to Jencks. In the Jencks case the court held a defendant was entitled to such pretrial statements without first establishing a conflict. The court said (353 U. S. 666, 77 S. Ct. 1012, 1 L. ed. [2d] 1111):

"* * * We hold that the petitioner was not required to lay a preliminary foundation of inconsistency, because a sufficient foundation was established by the testimony of Matusow and Ford that their reports were of the events and activities related in their testimony.

\* \* \* \* \*

"Every experienced trial judge and trial lawyer knows the value for impeaching purposes of statements of the witness recording the events

before time dulls treacherous memory. Flat contradiction between the witness' testimony and the version of the events given in his reports is not the only test of inconsistency. The omission from the reports of facts related at the trial, or a contrast in emphasis upon the same facts, even a different order of treatment, are also relevant to the cross-examining process of testing the credibility of a witness' trial testimony.

"Requiring the accused first to show conflict between the reports and the testimony is actually to deny the accused evidence relevant and material to his defense. The occasion for determining a conflict cannot arise until after the witness has testified, and unless he admits conflict, as in Gordon, the accused is helpless to know or discover conflict without inspecting the reports. A requirement of a showing of conflict would be clearly incompatible with our standards for the administration of criminal justice in the federal courts and must therefore be rejected. For the interest of the United States in a criminal prosecution '. . . is not that it shall win a case, but that justice shall be done. . . .' Berger v. United States, 295 U. S. 78, 88.

"* * * We hold, further, that the petitioner is entitled to inspect the reports to decide whether to use them in his defense. Because only the defense is adequately equipped to determine the effective use for purpose of discrediting the Government's witness and thereby furthering the accused's defense, the defense must initially be entitled to see them to determine what use may be made of them. Justice requires no less."

Mr. Justice Clark, in a dissenting opinion, stated (353 U. S. 681, 77 S. Ct. 1020, 1 L. ed. [2d] 1119):

"Unless the Congress changes the rule announced by the Court today, those intelligence agencies of our Government engaged in law enforcement may as well close up shop, for the Court has opened their files to the criminal and thus afforded him a Roman holiday for rummaging through confidential information as well as vital national secrets. This may well be a reasonable rule in state prosecutions where none of the problems of foreign relations, espionage, sabotage, subversive activities, counterfeiting, internal security, national defense, and the like exist, but any person conversant with federal government activities and problems will quickly recognize that it opens up a veritable Pandora's box of troubles."

Congress did react promptly to the Jencks decision, and on September 2, 1957, enacted Pub. L. 85-269, 71 Stat. 595, now coded as 18 USCA, § 3500, which to some extent circumscribes the effect of the Jencks decision.[1]

---

[1] "§ 3500. Demands for production of statements and reports of witnesses

"(a) In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) to an agent of the Government shall be the subject of subpena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

"(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

"(c) If the United States claims that any statement ordered to be produced under this section contains matter which does not relate to the subject matter of the testimony of the witness, the court shall order the United States to deliver such statement for the inspection of the court in camera. Upon such delivery the court shall excise the portions of such statement which do not relate to the subject matter of the testimony of the witness. With such material excised, the court shall then direct delivery of such statement to the defendant for his use. If, pursuant to such procedure, any portion of such statement is withheld from the defendant and the defendant objects to such withholding, and the trial is continued to an adjudication of the guilt of the defendant, the entire text of such statement shall be preserved by the United States and, in the event the defendant appeals, shall be made available to the appellate court for the purpose of determining the correctness of the ruling of the trial judge. Whenever any statement is delivered to a defendant pursuant to this section, the court in its discretion, upon application of said defendant, may recess proceedings in the trial for such time as it may determine to be reasonably required for the examination of such statement by said defendant and his preparation for its use in the trial.

"(d) If the United States elects not to comply with an order of the court under paragraph (b) or (c) hereof to deliver to the defendant any such statement, or such portion thereof as the court may direct, the court shall strike from the record the testimony of the witness, and the trial shall proceed

The history of the enactment of this statute is to be found in Palermo v. United States, 360 U. S. 343, 79 S. Ct. 1217, 3 L. ed. (2d) 1287. Apparently the statute was intended to permit the trial court to excise parts of the statement not relevant to the witness' testimony.

Since the Jencks case was decided under the supervisory power of the United States Supreme Court over Federal courts, Palermo v. United States, *supra,* it is not binding on the state courts. It has, however, led to a consideration and reconsideration of the problem by many of the state courts. As far as our research goes, it shows that they are about evenly divided as to whether they will follow the Jencks rule or not. So far as we have been able to determine, ten states now follow the Jencks rule and eleven reject it. Of the eleven states rejecting the Jencks rule, it would appear that nine do so, at least in part, because they were following precedents, holding that the trial court had discretion in this particular area, and most of them seek to justify the rejection of Jencks on the basis that it was merely an exercise of the United States Supreme Court's supervisory powers over criminal procedure in the lower Federal courts. See, Mabry v. State, 40 Ala. App. 129, 110 So. (2d) 250; State v. Pikul, 150 Conn. 195, 187 A. (2d) 442; Anderson v. State, 239 Ind. 372, 156 N. E. (2d) 384; State v. Hill, 193 Kan. 512, 394 P. (2d) 106; McKenzie v. State, 236 Md. 597, 204 A. (2d) 678; State v. Aubuchon (Mo.) 381 S. W. (2d) 807; Erving v. State, 174 Neb. 90, 116 N. W. (2d) 7; Gaskin v. State, 172 Tex. Cr. 7, 353 S. W. (2d) 467; State v. Robinson, 61 Wash. (2d) 107, 377 P. (2d) 248. The other two states apparently rejecting the Jencks rule also base their decisions largely on the

---

unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared.

"(e) The term 'statement', as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means—

"(1) a written statement made by said witness and signed or otherwise adopted or approved by him; or

"(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness to an agent of the Government and recorded contemporaneously with the making of such oral statement."

fact that the Jencks decision was merely an exercise of the Supreme Court's supervisory powers over the lower Federal courts. State v. Kelly, 249 Iowa 1219, 91 N. W. (2d) 562; Anderson v. State, 207 Tenn. 486, 341 S. W. (2d) 385.

It would seem that in most of the above cases the question facing the court was whether it should overrule an established precedent merely because the Supreme Court had done so in the Federal courts. They chose not to do so. Here the question is an open one, and we have our choice of adopting the rule which we think will best serve the interests of justice in this state.

Of the ten states that have adopted the Jencks rule it seems that only two can be said to have overruled previous decisions of their state courts. People v. Wolff, 19 Ill. (2d) 318, 167 N. E. (2d) 197; People v. Rosario, 9 N. Y. (2d) 286, 213 N. Y. S. (2d) 448, 173 N. E. (2d) 881. In the other decisions adopting the Jencks rule the decision was either in line with earlier decisions or a case of first impression in that state. State v. Saenz, 88 Ariz. 154, 353 P. (2d) 1026; People v. Chapman, 52 Cal. (2d) 95, 338 P. (2d) 428; State v. Hutchins, 51 Del. 100, 138 A. (2d) 342; Walker v. State, 78 Nev. 463, 376 P. (2d) 137; State v. Hunt, 25 N. J. 514, 138 A. (2d) 1; Commonwealth v. Smith, 412 Pa. 1, 192 A. (2d) 671; State v. Lavallee, 122 Vt. 75, 163 A. (2d) 856; State v. Richards, 21 Wis. (2d) 622, 124 N. W. (2d) 684.

Some indication appears from the decisions of other states as to what they may do when clearly confronted with the problem. It would appear that in two states the Jencks rule will be followed. State v. Morgan, 67 N. Mex. 287, 354 P. (2d) 1002; Chandler v. State, 230 Ore. 452, 370 P. (2d) 626. Two states may have implicitly adopted the discretionary rule. Russom v. State (Fla. App.) 105 So. (2d) 380; State v. Miller (Ohio App.) 176 N. E. (2d) 296. If indulging in speculation of this kind is of any value, it might appear that three states are likely to repudiate Jencks. State ex rel. Regan v. Superior Court, 102 N. H. 224, 153 A. (2d) 403; State ex rel. Sadler v. Lackey (Okla. Cr.) 319 P. (2d) 610; State v. Di Noi, 59 R. I. 348, 195 A. 497. A pre-Jencks opinion may have committed one state to the discretionary rule, Battalino v. People, 118 Colo. 587, 199 P. (2d) 897; and a post-Jencks opinion in another

state has adhered to its prior rule without expressly repudiating Jencks. Bellew v. State, 238 Miss. 734, 106 So. (2d) 146. We have no way of knowing what some of these states will do upon a reconsideration of former rules in the light of the Jencks decision and decisions from other jurisdictions made after Jencks.

The court in People v. Wolff, *supra,* after a careful analysis of alternative views, said (19 Ill. [2d] 327, 167 N. E. [2d] 201):

"Whether to adopt the Federal view or to retain the traditional view that the delivery of documents to an accused rests in the discretion of the trial judge in any case, presents a difficult choice. While the Federal rule is one of procedure, and therefore not binding before us, it is at the same time the latest and most thorough approach to the problem."

In the case of State v. Hunt, *supra,* the New Jersey court said (25 N. J. 530, 138 A. [2d] 10):

"In the instant matter the county prosecutor contends that the Jencks case is not binding upon us since it was not a constitutional holding but was an exercise of the court's control over the administration of federal justice. [Citations omitted.] Assuming that to be so, it still has persuasive force and its underlying principle of broad disclosure is particularly apt in state prosecutions where there is ordinarily no countervailing consideration resting on national security."

Having reviewed the cases on this subject we are convinced that adoption of the Jencks rule is in line with the modern tendency to afford a defendant in a criminal trial a fair opportunity to defend himself. If a prosecution witness has made a pretrial statement, why should not the defendant have a chance to see it? If the object is to search for the truth, any inconsistency in such statement might well have the desired result of finding out where the truth lies. We are convinced that the cases following the Jencks rule are the most persuasive and the most enlightened view on this subject today. We therefore now hold that after a witness testifies for the prosecution an accused person has the right to examine unprivileged pretrial statements of the witness [2] for the purpose of determining whether

---

[2] Statements producible under the Jencks Act are defined in subsection (e). See footnote 1, *supra.* We are dealing here only with statements that fall clearly

he wishes to use it for impeachment purposes, without laying any further foundation than that such statement has been made. If the prosecution objects to the statement on the ground of relevancy, the court, in camera, will decide whether the statement is relevant; and if it finds that the whole or a part thereof is not relevant to the testimony of the witness, it shall excise such part as is not relevant, retaining it, however, as a part of the record so that upon review the correctness of the court's ruling may be determined.

Fortunately the court did turn over to the defendant all pretrial statements except that of Peterson. We have examined the testimony of Peterson in the record and are convinced that even though, in the light of the rule which we now adopt, there may have been error, looking at the matter retrospectively, no substantial prejudice resulted to the defendant.[3] Even if we assume that Peterson's testimony was impeached, we doubt that it would seriously affect the outcome of the case. The trial court did examine the statement and found no inconsistency between it and the testimony. We are content to leave it there.

### MISCONDUCT OF JUROR

■ Shortly prior to the submission of the case to the jury, the trial court and counsel for defendant received a call from an attorney in Minneapolis, not connected with the trial, informing the court and counsel that either at a dinner or at a party he had a conversation with the owner of Midwest Patrol, which is a security agency in St. Paul, in the course of which it was related to him that the sales manager for the Midwest Patrol was related to one of the jurors and that at a dinner with the sales manager there was a comment made by the juror to the effect that "what is coming out in the trial does not compare with what has appeared in the newspapers."

---

within (e)(1). We leave for future determination what other statements of a witness may be within the meaning of the rule we adopt. See Annotation, 5 L. ed. (2d) 1014, 1025, where the Federal cases are collected.

[3] The rule of harmless error should apply. See, Rosenberg v. United States, 360 U. S. 367, 79 S. Ct. 1231, 3 L. ed. (2d) 1304; Karp v. United States (8 Cir.) 277 F. (2d) 843.

A hearing between counsel and the court was held in chambers, prior to a discussion of the charge to be given to the jury, in which this matter was discussed. The court indicated that the report was so vague that it did not warrant any action in the absence of a specific motion. No such motion was forthcoming and the case continued to completion.

This alleged misconduct of the juror has now been included as one of the grounds for which defendant seeks a new trial.

This whole subject is so exhaustively covered in Annotation, 31 A. L. R. (2d) 417, that it would be useless to discuss it in detail here. Our attention has been called to five decisions in which we have considered similar questions, namely, State v. Williams, 96 Minn. 351, 105 N. W. 265; State v. Lilja, 155 Minn. 251, 193 N. W. 178; State v. Soltau, 212 Minn. 20, 2 N. W. (2d) 155; State v. DeZeler, 230 Minn. 39, 41 N. W. (2d) 313, 15 A. L. R. (2d) 1137; and Gruenhagen v. Brelje, 252 Minn. 203, 89 N. W. (2d) 738.

These cases, and we think it is the general rule followed elsewhere, establish the proposition that before the fact that a juror may have read a newspaper article discussing certain aspects of the case will furnish the basis for a new trial it must appear (1) that the juror did read such article and was influenced thereby to the prejudice of the defendant; and (2) that, having knowledge of the fact prior to the submission of the case to the jury, the defendant requested appropriate action by the court.

If, having knowledge of the alleged misconduct, defendant chooses nevertheless to proceed with the trial to completion, it must be held that he has waived the irregularity.

The same rule is followed here as with respect to other misconduct of the jury. Whether a new trial should be granted or not rests largely in the discretion of the trial court, who has an opportunity to ascertain whether any prejudice has resulted. See, Ceylon Farmers Elev. Co. v. Fidelity & Deposit Co. 163 Minn. 280, 203 N. W. 985; State v. Warren, 201 Minn. 369, 276 N. W. 655; State v. Rediker, 214 Minn. 470, 8 N. W. (2d) 527; . Eichten v. Central Minn. Co-op. Power Assn. 224 Minn. 180, 28 N. W. (2d) 862.

On the showing made here it seems obvious that the court was correct in denying the new trial on this ground.

### DENIAL OF FAIR TRIAL

■ Defendant contends he has been denied a fair trial due to local prejudices created by unfair publicity given the case prior to trial. On an application by defendant for mandamus, we required a change of venue from Ramsey to Hennepin County. State v. Thompson, 266 Minn. 385, 388, 123 N. W. (2d) 378, 381. In so doing, we noted:

"* * * Probably no case in the memory of anyone in this locality has aroused so much interest and so much discussion as this one. Over a period of several months hardly a day has elapsed when something has not been said or written in a news medium of one kind or another. It is important that the constitutional guaranty of freedom of the press not be curtailed if we are to exist as a free people. It is equally important, however, that, when the unrestrained exercise of this right clashes with the right of an accused person to be tried by an impartial jury having no preconceived opinions as to the guilt or innocence of the accused, the rights of such accused person must be protected by transferring the case to a locality where the public may not have been influenced as much by the publicity that has been given the case."

Ordinarily a defendant on motion for change of venue does not have a right to select a particular county for his trial, but it is left to the trial court to choose a county in which a fair trial can be obtained. In this case, however, defendant was granted a change to Hennepin County at his request. It cannot be denied that the case was given an unusual amount of publicity, much of which could better have been omitted. The day may come when in this country we find a way to strike a fair balance between the constitutional guaranty of a free press and the constitutional right to a fair trial. It seems that we have not yet found a solution to that problem. The only safeguard now in existence is the self-restraint of news media, of which there seems to be a short supply in a case so packed with emotional appeal as this one. Until some better safeguard is available, about all we, as courts, can do is to scrutinize the record to ascertain as best we can whether a defendant has been deprived of a fair trial as the result of unfair publicity given the case. We agree with the conclusion of the New Jersey court in State v. Van Duyne, 43 N. J. 369, 204 A. (2d) 841, that

attorneys, both prosecution and defense, who publicly discuss the case and are quoted in the news media, particularly with respect to expressions of opinion as to guilt or innocence of the defendant, ought to be dealt with promptly by the court. Police officers, over whom we have no such disciplinary power, ought likewise to be dealt with by their superior officers to the end that criminal cases may be fairly tried in court and not in the news media.

It is doubtful in this case that a more fair trial could have been obtained elsewhere in this state. The same news coverage extended throughout the state as in Ramsey and Hennepin Counties. The case was one of public interest everywhere. We do not have a record of the voir dire examination of the jurors but are willing to accept counsel's statement that of some 112 jurors examined 67 expressed actual bias. That does not mean, however, that the 12 accepted were also biased.

Minn. St. 627.01 provides that a party accused of crime shall be entitled to one change of venue only. This provision is not so binding on the courts, however, that a further change cannot be granted if and when it affirmatively appears that a fair trial cannot be obtained in the county to which the venue is changed. A defendant accused of crime is entitled to a fair trial, which right cannot be circumscribed by any such limitation. But some responsibility rests on the defendant as well. Here no further request was made for a change from Hennepin County. Apparently defendant was satisfied with the place of trial until the jury decided adversely to him. On the record before us we cannot say he was denied a fair trial, nor are we convinced that a more fair trial could have been obtained elsewhere in the state. Criminal cases must be tried somewhere and, having gone as far as we did in this case in permitting the defendant to choose his own county, we do not know what more we could have done.

This is not a case like Estes v. Texas, 381 U. S. 532, 85 S. Ct. 1628, 14 L. ed. (2d) 543, where much of the unfair publicity came out of televising the trial itself. Here the prejudice, if there was any, was created mainly by publicity prior to the time the trial began. If it is assumed that a fair jury was selected, we doubt that any publicity from that time on created any prejudice against the defendant. The danger is that the prejudice was created before the case started so that a fair jury could not be ob-

tained. The experienced trial judge in this case did everything possible to insure a fair trial after it began.

## SUFFICIENCY OF THE EVIDENCE
## TO SUSTAIN A CONVICTION

■ Defendant contends the evidence taken as a whole does not sustain a conviction. His contention is predicated largely upon the assumption that the hearsay testimony of Anderson, Morris, Sharp, Ingram, and Butler should not have been admitted, and that in the absence of this testimony the case rests entirely upon circumstantial evidence which is insufficient to sustain the conviction.

We must concede that in the absence of the testimony of these witnesses it would be difficult to sustain the conviction of Thompson to the crime, but we have already held that this testimony was admissible. On appeal we are governed by the same rules as in any other case. In State v. Norgaard, 272 Minn. 48, 52, 136 N. W. (2d) 628, 631, we said:

"In passing upon the weight and sufficiency of the evidence we can only repeat that the scope of our review is limited to ascertaining whether under the evidence contained in the record the jury could reasonably find the accused guilty of the offense charged. If the jury, acting with due regard for the presumption of innocence and for the necessity of overcoming it by proof beyond a reasonable doubt, could reasonably conclude that defendant was proven guilty of the offense charged, a reviewing court will not disturb its verdict."

See, also, State v. Markuson, 261 Minn. 515, 113 N. W. (2d) 346.

We are also governed by the rule that on appeal this court must take the evidence most favorable to the state and must assume that the jury believed the state's witnesses and disbelieved anything which contradicted their testimony. State v. Homme, 226 Minn. 83, 32 N. W. (2d) 151; State v. Schabert, 222 Minn. 261, 24 N. W. (2d) 846, 31 Minn. L. Rev. 375. The credibility of the witnesses was clearly for the jury. While the character of the state's witnesses leaves much to be desired, if the jury believed them, as we must assume it did, their testimony, coupled with the circumstantial evidence corroborating it, is sufficient to sustain the verdict. It is true that much of the testimony relied upon by the state comes

from accomplices, which must be corroborated under § 634.04 before it can be accepted; but there is much by way of corroboration that we need not detail here. It is sufficient to say that in the light of all the evidence we cannot hold that the evidence is insufficient to sustain the verdict.

### NEW TRIAL ON GROUNDS OF NEWLY DISCOVERED EVIDENCE

■ We come then to the final and we think one of the important claims of the defendant, namely, that the trial court should have granted his motion for new trial based on newly discovered evidence.

After the conviction of defendant and the subsequent conviction of Mastrian, Anderson entered a plea of guilty to murder in the first degree. He, together with Thompson and Mastrian, was incarcerated in the Stillwater prison. The other witnesses linking Thompson to the crime—Morris, Sharp, Ingram, and Butler—after having been kept in jail for over a year on one charge or another, were all released after the two cases were over. Morris, who was charged with being an accessory after the fact, entered a plea of guilty and the sentence was suspended, with probation for 5 years. Ingram, who entered a plea of guilty to robbery in the first degree, was sentenced, and his sentence suspended. Sharp was held on a charge of burglary in the third degree but the charge was dismissed on motion of the county attorney. Butler was permitted to plead guilty of attempted robbery in the first degree and a 10-year sentence imposed was stayed and he was placed on probation. Anderson, who insisted, even to the end, that he understood he was to be permitted to plead guilty to murder in the second degree and that he would not have to serve over 5 or 6 years, finally entered a plea of guilty to murder in the first degree.

After an appeal had been perfected to this court by defendant, prison authorities found on the person of Anderson a partially completed letter addressed to the governor of Minnesota and the chief justice of the supreme court, in which he repudiated his entire testimony at the trial and completely exonerated Thompson and Mastrian. Anderson was thoroughly examined at the prison by counsel for defendant and under oath reiterated what he had stated in this letter. He stated that Thompson and Mastrian had nothing to do with the crime but that it was the result of an attempted burglary by him alone. Shortly thereafter he was removed from Stillwater prison and we remanded the case to the trial court for

hearing as to whether a new trial should be granted on the ground of newly discovered evidence. At the full hearing, in which Anderson was examined and cross-examined, he then repudiated the statement made at the prison and testified that what he had said at the trial was true. His explanation was that threats had been made on his life by Mastrian in the prison and other threats had come to him from Thompson through other inmates of the prison, and that he wrote the letter and gave the statement to defendant's counsel under oath for fear that these threats would be carried out if he did not do so.

It is apparent that Anderson has little regard for the truth and less for the sanctity of an oath. However, the trial court had an opportunity to observe him and to determine whether he was telling the truth at the trial and at the last hearing, or when he made his retraction in prison. We feel obliged to accept the determination of the trial court. There are discrepancies even in his latest statement, but in its essentials it does implicate Mastrian and, through him, Thompson in the commission of the crime.

Defendant cites in support of this motion the cases of State v. Myers, 154 Minn. 242, 191 N. W. 597, involving repudiation of his testimony by a key witness; State v. Star, 248 Minn. 571, 81 N. W. (2d) 94, involving a confession and exoneration by a person who did not testify at the trial; State v. Warren, 252 Minn. 261, 89 N. W. (2d) 702, involving admission of mistaken identity; and State v. Bock, 229 Minn. 449, 39 N. W. (2d) 887, which involved a question again of mistaken identity and an admission by another person that he had committed crimes similar to that of which defendant was convicted. In none of these cases was there a subsequent retraction of the statements made which exonerated the defendant. That is not true here. The question here is whether Anderson told the truth at the trial and at the last hearing, or while in prison when he retracted what he had said at the trial. It may well be true that if another jury heard all of these statements they would be less likely to believe Anderson. It may also be true that if they knew of the treatment accorded Morris, Sharp, Ingram, and Butler they would discount their testimony on the grounds that they may have testified as they did as the result of promises of leniency. Be that as it may, we must take the record as we find it and,

TERM INSURANCE POLICIES IN EFFECT ON CAROL THOMPSON'S LIFE WHEN SHE WAS MURDERED ON MARCH 6, 1963[1]

| Date of Application | Local Agent that Handled Application | Company | Amount of Insurance | Premium Paid | Type of Insurance | Expiration Date |
|---|---|---|---|---|---|---|
| Feb. 6, 1962 | James Treanor | Travelers Ins. Co. | 100,000 plus 100,000 accidental death | $597.70 | Term | April 9, 1967 |
| Feb. 14, 1962 | James Treanor | Travelers Ins. Co. | 100,000 plus 50,000 accidental death | $547.70 | Term | April 9, 1967 |
| April 4, 1962 | James Treanor | Accident Division of Travelers Ins. Co. | 100,000 | $110.00 | Accident | April 4, 1963 |
| April 10, 1962 | Floyd Peterson | Time Ins. Co. | 50,000[2] | $ 82.50 | Accident | May 1, 1963 |
| April 10, 1962 | Floyd Peterson | Continental Cas. Co. | 200,000[3] | $350.00 | Accident | April 10, 1963 |
| April 12, 1962 | James Treanor | Lloyd's London | 250,000 | $312.50 | Accident | April 11, 1963 |
| May 14, 1962 | John Winter | General Accident Co. | 30,000[4] | $ 32.40 | Accident | June 1, 1963 |
| May 21, 1962 | John Winter | Zurich Ins. Co. | 25,000[5] | $ 38.75 | Accident | June 13, 1963 |
| January 1963 | John Winter | Continental Cas. Co. | 50,000 | $ 75.35 | Accident | March 15, 1963 |

[1] On May 23, 1962, the defendant also was issued a 180-day accident policy on Carol's life for $20,000 ($50,000 was applied for) but this policy lapsed in November 1962.
[2] Coverage of $100,000 was applied for.
[3] The defendant was advised in November 1962 that this policy would not be renewed
[4] Coverage of $50,000 was applied for.
[5] Coverage of $50,000 was applied for.

accepting the trial court's determination that Anderson fabricated the story told in prison and not at the trial, we cannot hold that the court erred in denying a new trial on the grounds of this newly discovered evidence.

Affirmed.