T. Eugene **THOMPSON**, Petitioner,

v.

Bruce McMANUS, Warden,
Respondent.

No. 3–73–Civil–267.

United States District Court,
D. Minnesota,
Third Division.

June 25, 1974.

---

Peter J. Thompson, Community Defender, Minneapolis, Minn., for petitioner.

Warren Spannaus, Atty. Gen., of Minnesota, William B. Randall, Ramsey County Atty., Steven C. DeCoster, Asst. Ramsey County Atty., St. Paul, Minn., for respondent.

## MEMORANDUM AND ORDER

DEVITT, Chief Judge.

Petitioner, an inmate of Minnesota State Prison since 1963 and one time St. Paul lawyer, has filed a petition for writ of habeas corpus claiming he is held in custody in violation of the Constitution of the United States.

Petitioner was charged by indictment on June 25, 1963, with having caused the murder of his wife. Upon his application, a writ of mandamus was issued by the Minnesota Supreme Court directing a change of venue from Ramsey to Hennepin County. Following a plea of not guilty, petitioner was tried by a jury before Hennepin County District Judge Rolf Fosseen and on December 6, 1963 was found guilty of murder in the first degree. The state district court denied petitioner's motions for new trial and for acquittal notwithstanding the verdict and petitioner appealed. The Minnesota Supreme Court affirmed the judgment of conviction. State v. Thompson, 273 Minn. 1, 139 N.W.2d 490 (1966). The United States Supreme Court denied certiorari. Thompson v. Minnesota, 385 U. S. 817, 87 S.Ct. 39, 17 L.Ed.2d 56 (1966).

Petitioner then sought relief by petition for writ of habeas corpus in this court. Finding the application premature for failure to exhaust available state remedies, the petition was dismissed without prejudice. Thompson v. Tahash, D.C., 286 F.Supp. 663 (1968).

Thereafter, proceedings for post-conviction relief were commenced in state court pursuant to Minn.Stat. 590.01 et seq. A lengthy evidentiary hearing, extending, with continuances, over an eight month period, was conducted by Hennepin County District Judge Douglas K. Amdahl. The trial court found no constitutional merit in petitioner's allegations and denied relief. The Minnesota Supreme Court affirmed. Thompson v. State, 289 Minn. 270, 183 N.W.2d 771 (1971).

Petitioner now returns to this court and renews his claim of violation of federal constitutional rights. In substance his allegations are that: prejudicial publicity prevented his obtaining a fair trial, hearsay testimony was improperly received against him, the prosecutor

used illegally obtained evidence, perjured testimony was knowingly used against him, he was wrongfully denied a new trial on the basis of newly discovered evidence, he was inadequately represented by counsel at trial, the prosecution failed to disclose exculpatory evidence to the defense, and the Minnesota courts failed to take protective action sua sponte where events required it before and during trial. In the interest of making a complete record, a detailed statement of petitioner's claims is set out as follows:

"Petitioner states and alleges that he is being held in custody unlawfully due to violations of his Federal Constitutional rights as contained in the Fifth, Ninth, and Fourteenth Amendments in that:

a) The community, and specifically the jury pool from which the petitioner's trial jury was drawn, was so envenomed by sustained prejudicial pre-indictment, pre-trial, and trial publicity as to preclude any reasonable likelihood that a fair jury could be impanelled or fair trial held.

A great amount of daily publicity, commencing the day of petitioner's wife's death, was suspended throughout the community (the entire State) prior to arrest, prior to trial, and during trial through news media of every form; material containing and concerning the prosecutor's theory of petitioner's guilt and the evidence upon which it expected to rely.

b) The prosecutor and police officials made prejudicial pre-indictment and pre-trial statements to the news media charging the guilt of the petitioner.

The prosecutor and police made statements to members of the news media which implicated petitioner as the man responsible for his wife's death including but not limited to statements that:

(1) Larry McMullen, a deputy sheriff, disclosed that Dick W. C. Anderson said he had been hired by Thompson (petitioner) to kill Thompson's wife; that police officials said the Thompson murder was 'now solved completely' on the day of Thompson's arrest; and that prosecutor William Randall complained to the news media that Thompson had failed to come to his office to discuss the matter even though Randall was waiting in his office to discuss the matter with him.

c) The prosecutor offered and the court received against the petitioner, hearsay testimony purporting to show admissions which deprived petitioner of his right to confront witnesses against him.

The Prosecution used as part of its evidence, testimony by alleged assassin-conspirators Anderson, Butler, Ingram, Morris, and Sharp that they were hired to kill an unidentified out of town woman with four children (Anderson said that it was Thompson's wife) by one Mastrian, a client of Thompson's, who allegedly said that he was acting for Thompson. Mastrian did not testify and could not be produced since he was then under indictment and awaiting trial for the same murder. No conspiracy was established by evidence extrinsic to the testimony of these five burglars, rapists, and criminal assaulters.

d) The prosecutor used illegally obtained evidence to procure petitioner's conviction.

The St. Paul police searched petitioner's home without probable cause to believe he had committed the crime and without a warrant. Evidence derived from this search was admitted against him over his objection at trial.

e) The prosecutor knowingly used perjured testimony against petitioner.

Anderson, Butler, Ingram, Morris and Sharp denied at petitioner's trial directly or indirectly that they had been promised anything in exchange for the testimony against petitioner. As to each of these men, such denials

were untrue because the prosecutor had in fact made elaborate and definitive promises to each as to leniency in their individual cases. The charges pending against each of them, with the exception of Morris, did not arise out of the death of petitioner's wife.

f) Minnesota wrongfully failed to grant petitioner a new trial based on newly discovered evidence which, had it been submitted to a jury, would have changed the judgment of conviction to a judgment of acquittal.

After petitioner's conviction, the chief witness against him, Dick W. C. Anderson, recanted his testimony at trial in two letters to the Governor and in two depositions under oath taken at the prison. He stated that his entire testimony was concocted—with the help of the prosecutor—and that it had been induced by the false and clandestine promises of prosecutor Randall who expected to become, as a result of publicity attending the Thompson conviction and trial, the governor or attorney general of Minnesota and, who, from that high office, would then sharply reduce Anderson's sentence for his admitted murder of Mrs. Thompson. A Motion for New Trial based on this statement by Anderson was denied and so was the appeal therefrom.

g) Petitioner was denied adequate representation by his trial attorney, Hyam Segell.

Petitioner was on trial for his life and had made funds available to his attorney, Hyam Segell, to adequately and properly conduct an investigation with competent, capable investigators who were to be hired directly by Segell and were to report only to Segell— not to the petitioner also—as to the facts surrounding the death of his wife in order to prepare for trial. His attorney did not conduct such an investigation and, in fact, spent one of the funds available just for this purpose. As a condition to representation, Segell made Thompson promise to stay out of the case and not

to be looking over his shoulder checking up on him. Such failure to investigate on the part of Segell was not known to the petitioner until after the trial.

h) The prosecutor failed to disclose to petitioner or his attorney exculpatory evidence contained in the prosecutor's file and not known to the petitioner.

There is in existence in the prosecutor's file a blood report showing the presence of a person with a blood type at the scene of the crime that does not match that of Mrs. Thompson or Dick W. C. Anderson, both of whom have type O blood; however, it does match the blood type of one of the alleged assassin-conspirators, to wit: Ingram.

There is also in existence in the prosecutor's file an investigation report, in great detail, of Dick W. C. Anderson conducted by the insurance companies that insured the life of Mrs. Thompson; this report and investigation was conducted at the request of the prosecutor in compliance with part of his promises to Anderson for his testimony as given; that facts in this report refute some of the material testimony of Anderson given at trial. The Minnesota Court refused to allow access to this report upon request and proper showing by the petitioner. The report was completed prior to trial.

i) The Minnesota Courts violated the petitioner's Constitutional rights in their rulings and in their failing to rule sua sponte where necessary to protect the petitioner during the preliminary stages prior to trial and during trial.

Specifically the Minnesota Courts did not protect petitioner's rights in that:

(1) The trial court did not issue any cautionary instruction to the jury prohibiting them from reading or listening to the news about the trial proceedings.

(2) The trial court did not sua sponte sequester the jury even though it was obvious that the jury should be so sequestered to protect them during the trial.

(3) The trial court did not order sua sponte a second change of venue when the need for the same became obvious even though there was in existence a state statute allowing only one change of venue.

(4) The trial court did not sua sponte order a mistrial when President Kennedy was assassinated during the trial on Nov. 22, 1963, and the adverse effect of this assassination upon petitioner's right to a fair trial became obvious. Petitioner had asked his attorney Segell to ask for such a mistrial but Segell did not do so—at least nothing in the record shows that he did so ask.

(5) The trial court allowed the press to occupy space within the bar of the courtroom during the trial which interfered with petitioner's right to a fair trial and his opportunity to consult with his attorney during the trial.

(6) Petitioner was denied the right to a preliminary hearing even though he properly and timely requested the same.

(7) The Grand Jury which indicted petition violated the laws of Minnesota during their deliberations and the proof of this fact is contained in a sealed envelope which the court of Minnesota refused to open and examine, thereby denying petitioner of a fair trial or due process of law.

(8) The post-conviction court refused petitioner the right of discovery procedure or confrontation of witnesses who had material testimony to give relating to that procedure.

(9) The post-conviction court refused petitioner the right to examine alleged investigation reports conducted by his attorney, Hyam Segell, personally."

Petitioner was permitted to proceed here in forma pauperis. The court's Community Defender, Peter J. Thompson, was appointed to represent him.

Petitioner's counsel moved for an evidentiary hearing to take additional testimony. Over objection of respondent, the court permitted the taking of testimony of two witnesses, Marvin Johnson in Phoenix, Arizona, and John Healy in New York City. Their testimony, with exhibits, has been filed. The records of all prior proceedings have been made available to the court. Extensive briefs have been submitted. Oral argument was heard on June 11, 1974.

The facts of the case and a summary of the evidence are fairly summarized by the Minnesota Supreme Court in State v. Thompson, 273 Minn. 1, 139 N. W.2d 490 (1966).

Petitioner admits that all grounds for habeas corpus relief alleged here have been passed upon by the state courts. Both parties agree that petitioner has exhausted his state remedies.

I am satisfied that petitioner had a full, fair and adequate hearing in the state courts and that the record of those proceedings fairly supports the factual determinations made by the state courts.

In preparing their briefs counsel for both parties have followed the same format, numbering their arguments I through VI.

I. *Claimed Illegal Search and Seizure*

Petitioner claims that some of the items seized by the police at petitioner's home shortly after Mrs. Thompson's death were improperly received in evidence—particularly parts of a pistol and a red hose ("whopper")—as being in violation of Fourth Amendment rights.

This issue has been heard, studied and decided by three competent and experienced Minnesota District Judges (Rensch, Fosseen and Amdahl) and by the Minnesota Supreme Court. In my

view, it was properly decided. The search was reasonable under the circumstances. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The search was not directed at petitioner who was then not a suspect but a cooperating aggrieved husband who urged the police to find the culprit. Mrs. Thompson was assaulted between 8:30 and 9 A.M. on March 6, 1963; the police were called and arrived about 9:15 A.M. and entered the Thompson house via the open front door and immediately commenced their investigation to find the assaulter. It is frivolous to claim that in such an emergency situation with an assaulted and dying lady on their hands and a cooperating husband standing by, the police would have to go to court for a warrant to search the premises of the very person who was just assaulted there.

I am fully satisfied that the Fourth Amendment illegal search claim was properly denied by the state courts.

## II. *Prejudicial Publicity*

Petitioner claims prejudicial publicity in the news media prevented him from receiving a fair trial citing principally Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966).

The record reflects stories, particularly reporting expressed opinions of police officers, from St. Paul newspapers which well may be viewed as prejudicial (the Minnesota Supreme Court so viewed them) but there is no showing that the jurors in the case read these stories. Indeed, following their publication, petitioner moved for a change of venue to Hennepin County, a change which the Minnesota Supreme Court directed. Jury selection started on October 28, 1963, some four months after most of the stories were published in the spring and early summer of 1963. Defendant claims that the record shows that none of the jurors selected had read any of the stories in the St. Paul newspapers. Petitioner does not dispute this.

There is no claim of prejudicial publicity in the Minneapolis newspapers either before or during trial or in the St. Paul newspapers during trial.

The *Sheppard* case condemned the prejudicial publicity reflected by the record in that case but the facts there were markedly different from those present here. I concur in the conclusion of post-conviction Judge Amdahl in saying that "The news media in *Sheppard* put forth a concerted effort to destroy Sheppard and to poison the minds of those in the community to the extent that Sheppard could not obtain a fair trial." That was not true in this case as a reading of the record and an examination of the exhibits show.

■ It must be remembered that the media has the right, and duty, to report crime and court news. Direct limitations on the press in this regard are not consonant with the First Amendment or a democratic society which depends on the free flow of information for public scrutiny for what "transpires in the courtroom is public property." Craig v. Harney, 331 U.S. 367, 374, 67 S.Ct. 1249, 1254, 91 L.Ed. 1546.

■ So the mere fact that this case was accompanied by much publicity by itself is not decisive. The test is whether the publicity was prejudicial, whether the jury was exposed to it, and if so, whether the prospective jurors could lay aside impressions or opinions derived therefrom and render a verdict based on the evidence presented in court. United States v. Woods, 486 F.2d 172, 174 (8th Cir. 1973), United States v. Ringland, 497 F.2d 1250 (8th Cir. 1974).

■ Here it has not been shown that any person served as a juror who was exposed to prejudicial publicity or who held a previous opinion as to the guilt or innocence of petitioner.

Chief Justice Oscar Knutson's conclusion that publicity before and during trial did not adversely affect a fair trial (183 N.W.2d at 773) is well supported by the record.

### III. A. *Failure to Disclose Exculpatory Material*

■ Petitioner claims that the prosecutor's failure to disclose a background report on witness Dick W. C. Anderson made by an insurance company investigator violated the "Brady Rule" (Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215) and denied him due process of law.

The 59 page report made by the Retail Credit Company was submitted in connection with the deposition testimony of John J. Healy and the court has read it. Nothing contained in it has any material bearing on Anderson's testimony, could not have been used for impeachment and by no stretch of logic could it be said that the prosecution's failure to make it available to petitioner was in violation of *Brady* or of Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 or of Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 or of any other decision of the federal courts. The report is a rather rambling recital of Anderson's history and activities since childhood. No request was made for it and if a request for information favorable to the accused had been made, it reasonably would not have occurred to a prosecutor to include such a report because it was not pertinent, would have been of no utility to the defense and was not exculpatory of the defendant.

### IV. *Failure to Grant a New Trial*

Petitioner claims he was denied due process because of the state court's failure to grant him a new trial on the ground of newly discovered evidence showing perjury by witness Dick W. C. Anderson, exceptional leniency granted to four prosecution witnesses and proof that another person, Willard Ingram, was in the victim's home the day of the murder.

I doubt if this claim, failure to grant a new trial for newly discovered evidence, is cognizable by a federal court in a post-conviction proceeding. The Supreme Court told us in Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed. 2d 770, that "The existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus." (83 S.Ct. at 759)

■ But even if cognizable this issue was fairly and properly decided by the state courts. The principal claim here is that after Dick W. C. Anderson was incarcerated in the Minnesota State Prison at Stillwater he recanted his testimony implicating the petitioner. Petitioner was also confined at the Minnesota Prison at that time. The record well justifies the conclusion that Anderson's recantation of his testimony was brought about through pressure and threats by petitioner to harm Anderson's chances for parole and through threats of physical violence. Anderson subsequently recanted his recantation, affirmed in open court the testimony he gave at trial, and told of the threats by petitioner to harm his parole chances and to inflict physical harm upon him.

■ As to the claim that witnesses Morris, Sharp, Ingram and Butler received inordinately lenient dispositions of their cases by the prosecution, the post-conviction court permissibly found that the record did not reflect any impropriety on the part of the courts or prosecutors in the disposition of the cases involving Morris, Sharp, Ingram and Butler and that the sentences imposed were not in fact excessively lenient.

■ There was no substantial admissible evidence to support the claim that one Willard Ingram was in the Thompson home the day of the murder.

### V. *Admission of Hearsay Evidence*

Petitioner claims that hearsay evidence was admitted against him in violation of his Sixth Amendment rights.

Witnesses Anderson, Morris, Sharp, Ingram and Butler testified to statements made to them by Mastrian who was allegedly engaged by petitioner to find someone to murder his wife. Mastrian did not testify.

■ The admission of this kind of hearsay is admissible under the co-conspirator exception to the hearsay rule where there is prima facie proof of the existence of a conspiracy to commit a crime. Schine Chain Theatres v. United States, 334 U.S. 110, 68 S.Ct. 947, 92 L. Ed. 1245 (1948); United States v. Schroeder, 433 F.2d 846 (8 Cir. 1970). The rule is the same in the Minnesota courts. State v. Thompson, 273 Minn. 1, 139 N.W.2d 490; State v. Dunn, 140 Minn. 308, 168 N.W. 2.

Substantial evidence was introduced to show a conspiracy to commit the crime of murder. The Minnesota Supreme Court succinctly summarized it as follows:

"Looking at the evidence in this case, we have, as establishing prima facie a conspiracy, the rather unusual amount of insurance taken out shortly before the murder was committed, of a type that would expire for the most part shortly after the date of the murder, and a large part of which was payable in the event of accidental death of the insured. The policies were all owned by the beneficiary. We have the defendant's affair with Jackie and his apparent desire to continue it, if we believe her testimony; his numerous contacts and telephone conversations with Mastrian; removal of a dog that might have sounded a warning, shortly before the commission of the crime; removal of a telephone that made it necessary for Mrs. Thompson to go downstairs to answer the telephone; the early appearance of defendant at his office on the fatal day and the previous day when the crime could have been committed; his stock transactions with Mastrian, resulting in a substantial loss to defendant and quite a gain to Mastrian; the locking of the front door, which was unusual; defendant's intention to withdraw $5,000 from his bank account, and the prior possession of a large amount of cash, of which $2,500 was returned to Mastrian by Mr. Connolly, without deduction of any por-

tion thereof for the services rendered by Thompson. There is much evidence explaining many of these actions. The removal of the dog was quite satisfactorily explained by showing that new carpeting had been placed in the hall and that the dog had stained the former carpeting. Removal of the telephone was also quite satisfactorily explained by showing that due to redecorating of the home another type of telephone was desired. While there are many things that cast doubt upon some of the evidence that would go to establish conspiracy, there is enough, we think, to permit the admission of hearsay statements of the witnesses involved for the purpose of connecting defendant with the conspiracy. These statements came from the mouths of individuals who, to say the least, left much to be desired as contemplated conspirators, even in crime, but the weight and credibility of their testimony was for the jurors, who had the chance to observe them and to evaluate the truth of what they were saying." 139 N.W.2d at pages 503, 504.

■ This evidence and the inferences to be drawn from it was sufficient to establish a prima facie agreement to commit murder between petitioner and Mastrian and, under the rule, to permit the admission of the testimony of Anderson, Morris, Sharp, Ingram and Butler.

Petitioner was not denied his Sixth Amendment rights.

VI. *Inadequate Assistance of Counsel*

Petitioner claims he was deprived of his constitutional guarantee of adequate counsel because his attorneys failed to continue a trial surrounded by prejudicial publicity, failed to properly investigate the defense, failed to sequester the jury, failed to move for a mistrial at crucial occurrences and failed to object to or cross-examine improper evidence.

Petitioner was represented by three experienced trial attorneys of excellent

reputation, each of whom had served as a federal prosecutor in this court. Petitioner himself was a qualified member of the Bar with extensive experience in criminal defense work. At the time of trial he was chairman of the Criminal Law Committee of the Minnesota Bar Association. He selected his own counsel and was free to discharge them at any time.

 It must be remembered that "the right to counsel does not mean the right to successful counsel." Austin v. Erickson, 477 F.2d 620 (8 Cir. 1973). It is easy to second guess trial tactics after the fact. This record shows that counsel were competent, alert, vigorous and dedicated and exerted their best efforts in accordance with high professional standards to represent the petitioner in a very difficult case.

The background and experience of each of petitioner's counsel, Hyam Segell, William Fallon and C. Paul Jones is recited by post-conviction Judge Amdahl, along with his appraisal of the record reflecting on their competence, as follows:

"Petitioner alleges that he 'was denied his constitutional right to a fair and impartial trial when his attorney failed to adequately and competently represent him.'

"While petitioner's allegation is couched in the singular and refers to 'his attorney', petitioner, in fact, employed his trial attorneys, Hyam Segell and William Fallon, in the latter part of April, 1963 about a month prior to the time of the Grand Jury indictment of June 25, 1963 which charged him with the crime for which he was tried.

"Also, prior to the employment of Mr. Segell and Mr. Fallon, petitioner was represented by C. Paul Jones, whose representation of petitioner continued until after an eight-hour conference on or about April 27, 1963 at which time at least (the record does not show that other persons were or were not present) Mr. Jones, Mr.

Fallon, Mr. Segell and petitioner were present. Among the things discussed at that conference was the matter of hiring an investigator, and the conclusion of such discussion was that a private investigator should not be employed. The record indicates that Mr. Thompson not only agreed to the conclusion reached, but played an active part in reaching that conclusion. Mr. Segell's testimony (page 994 of Volume IV of the Transcript of Proceedings, Line 3,) states:

'As a matter of fact, I am not so sure that it wasn't Mr. Thompson who balked at the idea of hiring such an investigator.'

"This Court finds that Mr. Thompson's testimony (see page 320, Volume II. Transcript of Proceedings, Lines 2 to 22) to the effect that he gave carte blanche authority to his counsel to hire investigators, is false.

"Mr. Segell is a graduate of the University of Minnesota Law School and graduated in August of 1948 from that school. Subsequent to graduation he remained at the University to complete some courses in the sociology department in criminology and penology and entered private practice of law in February of 1949. He remained in private practice until June of 1957. He had a deep interest in the field of criminal law and used every opportunity available to him to practice criminal law. He was appointed to public defender in Ramsey County, Minnesota and accumulated considerable experience in the field of criminal law. In June of 1957 Mr. Segell became an assistant United States Attorney for Minnesota and did considerable work in the criminal law field for that office until he left the office in the fall of 1960. He then became first assistant corporation counsel for the City of St. Paul, Minnesota and handled many criminal proceedings for such office until he left said office in July, 1961. At the latter time Mr. Segell returned to private practice. He is now a Dis-

trict Judge for the District Court of Ramsey County. Mr. Segell's experience as a practitioner of law at the time he was employed by Mr. Thompson encompassed many years and was greatly weighted on the side of criminal matters.

"At the time Mr. Segell was earning the foregoing impressive credentials as a lawyer, he also earned a reputation among the bench and bar as an excellent, able and ethical lawyer both in trial and other types of legal representation.

"Mr. Fallon graduated from the University of Minnesota Law School in 1956. From August of 1956 until August of 1958 he was an assistant Staff Judge Advocate in the United States Air Force. In October of 1958 he became an assistant United States attorney. and held such office until July of 1961 when he entered the private practice of law. He had some experience in both defense and prosecution cases while in the military service and handled prosecutions while employed by the United States Attorney's office. He had some criminal defense work from the time he entered private practice before he was engaged by Mr. Thompson. At the time he was employed by Mr. Thompson, Mr. Fallon also enjoyed a general reputation of being a capable and ethical attorney.

"The record does not disclose the credentials of C. Paul Jones. This could well be because both petitioner and respondent are of the opinion that the excellence of those credentials is so well known throughout this state that a recitation of such credentials on the record was unnecessary. Mr. Jones has specialized in the field of criminal law for many years. He has taught, and continues to teach, a course in criminal law at one of our law schools, and is the author of books on criminal procedure. He is presently the state public defender for the state of Minnesota and has earned a national reputation of excellence in legal ability

while in that office. For some years he was employed as an assistant county attorney of Hennepin County, Minnesota, and during a large part of the time there he was the first assistant county attorney in charge of criminal matters. His experience in the prosecution and defense of criminal matters is unrivaled, in this Court's opinion, by any other lawyer in this state.

"It must be further noted here that petitioner himself was an attorney duly admitted to practice law in the State of Minnesota. In its decision on the appeal of Mr. Thompson from the judgment of conviction, the Supreme Court of this state observed (273 Minn. 1, 4; 139 N.W.2d 490):

'At the time defendant's wife was killed, defendant was a practicing attorney of some prominence in the City of St. Paul. He was admitted to the bar in 1955 after having attended Macalester College from 1946 to 1950 and the St. Paul College of Law from 1951 to 1955. After working at some jobs that are not of importance here, he began practicing law and quite successful, mainly in the fields of personal injury, domestic relations, and criminal law. He was very active in bar association activities and did some teaching at the William Mitchell College of Law.'

"Among the bar association activities the petitioner took part in were activities relating to criminal law. He was a member of the Minnesota State Bar Association Criminal Law Committee and was also chairman of that group. In addition, petitioner was interested in the field of criminal law and handled some cases of prominence as a defense lawyer. It was his intention to specialize to a greater extent in the field of criminal law as evidenced by his application to Northwestern University's Criminal Law and Procedure course.

"The general competency of petitioner's trial counsel is set forth in prior paragraphs in the discussion of

this allegation. Petitioner now asserts that such counsel were incompetent in their representation of him in the proceedings resulting in his conviction. In addition to the testimony which has been presented during this post-conviction hearing, the court has before it the Clerk of Court's files in this matter, including a transcript of the trial proceedings (in 7 volumes) consisting of approximately 2,400 pages, and a transcript of the jury selection proceedings. A reading of the record adequately illustrates petitioner's counsel performed exemplary service on his behalf and that they were diligent and thorough in their representation of the petitioner."

These attorneys fully met the "mockery of justice" standard required of defense counsel by this circuit. Cardarella v. United States, 375 F.2d 222 (8th Cir. 1967); Brown v. Swenson, 487 F.2d 1236 (8th Cir. 1973); McQueen v. Swenson (8th Cir. 1974), the "reasonable counsel" standard required by the Fifth Circuit, MacKenna v. Ellis, 280 F. 2d 592 (5th Cir. 1960) and the "normal competency" standard required by the Third Circuit, Moore v. United States, · 432 F.2d 730 (3rd Cir. 1970). In fact, the quality of their representation was far above all such standards.

■ Petitioner was not denied effective assistance of counsel; he was fortunate to have Messrs. Segell, Fallon and Jones represent him with the dedication and competence the record reflects.

VII. *Illegality of Grand Jury Action*

Petitioner alleges denial of due process in connection with the reception by the Grand Jury of "illegal" evidence, violation of confidentiality and denial of access to Grand Jury minutes.

■ The principal contention here is that a second Grand Jury indicted petitioner after a previous Grand Jury had not done so, the argument apparently being that the indicting Grand Jury considered hearsay or incompetent evidence. There is no support in the record for this claim but even if there were evidence to show the reception of such evidence, the law is clear that this would not invalidate the indictment for the United States Supreme Court has held that "An indictment returned by a legally constituted and unbiased grand jury, * * * if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more." Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 409, 100 L.Ed. 397 (1956). The United States Supreme Court recently reaffirmed the principle and said " * * * an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence." United States v. Calandra, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974).

This claim is baseless.

The court has examined each of the claims set out in the petition (see above) and finds that petitioner has not established such claims and is not entitled to the relief requested. Petitioner's federal constitutional rights have not been violated.

The evidence is strong and convincing that petitioner engaged Mastrian to contract for the murder of his wife and that the hired man, Dick W. C. Anderson, did so. The trial was conducted with appropriate decorum and fairness; no improper prejudicial evidence was received; there was no showing of prejudicial publicity affecting the trial; petitioner was adequately represented by competent counsel of his own choosing who conducted a proper and vigorous defense.

This court, at public expense, furnished petitioner a lawyer experienced in criminal matters who spent many days in preparation of petitioner's case. Counsel presented an excellent brief. Petitioner was personally present at the hearing and was afforded the opportunity to participate in it. Petitioner has had his day in federal court and I am well satisfied that his claims are without merit. The petition is denied.